C.A. NO. 11-CV-10909-DPW

WENTWORTH PRECIOUS METALS,
LLC,

      Plaintiff

v.

CITY OF EVERETT, CARLO DeMARIA,
JR., as he is the Mayor of the City of
Everett, FRANK NUZZO, as he is the
Code Enforcement Officer of the City of
Everett, and JOHN FIELD, as he is the
Building Inspector of the City of Everett,

      Defendants

DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF FACTS

## I.    **PARTIES**

### **Mayor Carlo DeMaria**

1.    Mayor Carlo DeMaria ("Mayor") was elected as Mayor of the City of Everett ("City") in

2007.  (Exhibit 1, p. 7, ll. 5-15; Exhibit 2 Mayor Affidavit, ¶1).

### **John Field (Former Building Inspector/Director of Inspectional Services)**

2.    At all relevant times, Field served as the City's Director of Inspectional

Services/Inspector of Buildings/Zoning Enforcement Officer.  (Exhibit 3, p. 8, ll.8-13; p.

16, ll. 2-8).

3.    Field applied for the job with the City after he saw a posting in the Massachusetts

Municipal Association job listings.  He sent in a resume and was interviewed by Bob Joy,

the Director of Human Resources and Melissa Murphy ("Murphy"), the Mayor's Chief of

Staff.  (Exhibit 3, p. 8, ll. 14-21).  Field met the Mayor briefly for the last couple of minutes of the interview.  (Exhibit 3, p. 8, ll. 22-24).

4.     Prior to being hired by the City, Field had seven (7) years of experience as the zoning enforcement officer for other municipalities in Massachusetts.  (Exhibit 3, p. 7, ll.2-24).

5.     Field is a certified Massachusetts Building Inspector and is also a registered Professional Engineer, licensed by the Commonwealth of Massachusetts.  (Exhibit 3, p. 5, ll. 13-24).

6.     Field did not know anyone that worked for the City before he was hired for the Inspector of Buildings' position.  (Exhibit 3, p. 9, ll. 1-6).  Prior to interviewing for the job, Field had never met the Mayor, his Chief of Staff, the City Solicitor and did not know any other City official.  He also had never met any principal of the plaintiff.  (Exhibit 4, ¶1).

7.     Prior to beginning his employment with the City in March 2010, he had not done any work for businesses in the City or any individual that lived in the City.  (Exhibit 3, p. 11, ll. 14-17; p. 30, ll. 7-9).

8.     In July 2011, the City reorganized its Building Department, which became the Inspectional Services Department.  At that time, Field became the Director of Inspectional Services.  Field served in this position until he left to take a new position as the Building Inspector/Zoning Enforcement Officer for the Town of Weston on June 6, 2012.  (Exhibit 3, p. 19, ll. 9-16; Exhibit 4, ¶3).

9.     At all relevant times, Field had "complete responsibility" for interpreting, as well as enforcing, the City's Zoning Ordinance and the State Building Code.  (Exhibit 3, p. 22, ll. 7-11; Exhibit 4, ¶5).

**Frank Nuzzo (Director of Code Enforcement)**

10.     Frank Nuzzo is the City's Director of Code Enforcement.  (Exhibit 3, p. 17, ll. 19-21).

11.     Plaintiff has never alleged any conduct or action by Mr. Nuzzo with respect to the Property.

**Joseph Marchese, Jr./Wentworth Precious Metals, LLC/Scrap-It**

12.     Joseph Marchese, Jr. ("Marchese") is the principal and sole manager of a number of entities that own properties and hold licenses in the City of Everett.  One of these entities is the plaintiff, Wentworth Precious Metals, LLC ("Wentworth"), which holds licenses for the operation of a scrap metal, junk and recycling facility at the subject property, which is located at 431 Second Street - 0 Terminal Street, as well 413 to 421 Second Street, Everett ("Property").[1]  ((Exhibit 5, p. 33, l. 23-p. 34, l.2; Exhibit 3, p. 15, ll.13-17).

13.     Marchese leases the Property to Minichiello Brothers, Inc. d/b/a Scrap-It ("Scrap-It"), which operates a scrap metal, junk and recycling facility at the Property (Exhibit 3, p. 15, ll. 17-21; Exhibit 5, p. 9, ll. 2-11).

14.     Marchese is also the sole manager, of Dexter Street LLC, which owns property on Dexter Street in the City, where another location of Scrap-It operates.  (Exhibit 5, p. 32, ll. 5-14). The Dexter Street location is in the City's Industrial Zone.  (Exhibit 5, p. 44, ll. 8-10).

---

[1] Two different entities actually own the property, Zero Terminal Street, LLC and Marchese Realty, LLC.  Neither of these entities is named as a plaintiff in the case, but Marchese is the sole principal and manager of both of them. (Exhibit 5, pp. 11-13).

**II.** **WENTWORTH'S PROPERTY AND RELEVANT ZONING**

15.     The Property is located in the City's Industrial Limited District ("ILD"). (Exhibit 5, p.

44, ll. 11-13).

16.     Section 21 of the Zoning Ordinance provides that "no building, structure or premises

shall be used…in whole or in part for any use except as provided herein:

> **1.** Hotels and motels.
> **2.** Research and development facilities.
> **3.** Retail uses where goods are sold or services rendered primarily at retail.
> **4.** Offices and banks.
> **5.** Storage of goods in containers where all storage is contained within the building, not including storage of any raw or natural materials.
> **6.** Light manufacturing entirely contained within the structure with no associated emissions of noxious odors or noise.
> **7.** Heavy manufacturing by Special Permit providing there is no outside storage work and there is no emissions of noxious odors, smoke or noise, and no vibration discernible on the exterior of the building.

(Exhibit 6) [emphasis added].

17.     In addition, Section 27 of the Zoning Ordinance imposes various dimensional

requirements on, and requires a special permit for, the following uses (among others):

> -     Junk Yard/Facility, defined as "an area or structure used for the storage and/or sale of old or scrap copper, brass, … batteries…, junked dismantled or wrecked automobiles, or parts thereof; iron, steel, and other old or scrap ferrous or non-ferrous materials…"
>
> -     Materials Recovery Facility (MRF), defined as "an area in conjunction with a building/structure intended and designed to receive and process materials such as wood, paper, metals, or plastics for the purpose of recycling said materials into usable products and/or materials for resale to industry and commerce…"

(Exhibit 7) [emphasis added].

### III.    **WENTWORTH'S PERMITTING HISTORY**

18.    In 2008, Marchese purchased the Property with the intention of leasing it to Scrap-It as a second location in the City (in addition to Dexter Street) to conduct scrap metal/recycling operations.  (Exhibit 5, p. 45, l. 19-p. 46, l.1).

19.    On November 17, 2008, Marchese submitted a Building Permit Application for the Property on behalf of Wentworth.  The proposed use of the Building Permit was for "storage."  (Exhibit 5, pp. 87-88). The Building Department issued the Building Permit on April 8, 2009.  (Exhibit 29).

20.    Marchese stated in the Building Permit Application that he intended to construct two buildings on the Property—one to be 116'x55' and one to be 55'x65'.  Marchese, however, did not construct the 55'x65' building, because "[t]here was no need to." (Exhibit 5, p. 89, ll. 1-10).  Minichiello also testified that he has no intention to construct the second building at the Property at the present time.  (Exhibit 8, p. 121, ll.15-19).

21.    Marchese also sought a number of licenses, including Precious Metals and Junk Dealers licenses.  These licenses were granted with the condition that the "<u>all operations & storage shall be done in the building</u>."  (Exhibit 4, ¶23; Exhibit 9) [emphasis added].

22.    On June 23, 2008, Marchese testified before the Board of Alderman's Committee on Licenses ("Committee") and provided an overview of the Property's proposed use and operation.  He testified that Scrap-It's operation and storage would be done <u>entirely inside</u> the new buildings to be constructed.  (Exhibit 10; Exhibit 5, p. 95, ll. 4-8).

23.    In approving Wentworth's license application, the Committee stated that "<u>all operations and storage shall be done inside the new building</u>."  (Exhibit 10) [emphasis added].

24.     Marchese also was required to submit an application for Site Plan Review to the City's

        Planning Board, which he did on November 25, 2008.  The Site Plan application

        specified that Marchese would construct two buildings.  (Exhibit 11; Exhibit 5, p. 101,

        l.17-p. 102, l. 7).  Marchese also stated in the Site Plan Review narrative that "[t]he

        overall development will provide storage of goods and materials in the buildings."

        (Exhibit 11) [emphasis added].

25.     The Planning Board submitted its Site Plan Referral Form and Request for Review

        Comments to the Building Department prior to its meeting on December 22, 2008.

        (Exhibit 12).  After reviewing the Site Plan Application, Local Building Inspector

        Michael Desmond ("Desmond") informed the Planning Board that "the storage must be

        in containers within the building.  Per Section 21 Industrial Limited District (a) uses line

        5 of the City of Everett Zoning Ordinance."  (Exhibit 12) [emphasis added].

26.     In response to these comments by Desmond, Marchese assured the Planning Board on

        December 15, 2008 that "all goods and materials are trucked to the site in containers to

        be stored within the structures.  Due to the value of the items it would not be secure in the

        open area.  Upon sale of the materials the items are transported to the end user/or

        buyers."  Marchese further guaranteed the Planning Board that "[t]here shall be no

        employees on the site;" that '[a]ll employees shall be using [bathroom] facilities at the

        Dexter Street location." [2] (Exhibit 13; Exhibit 5, p. 111, ll. 9-21) [emphasis added].

27.     On January 12, 2009, the Planning Board approved the application for Site Plan

        Approval.  (Exhibit 14).  In its Decision, the Planning Board specifically required that all

        work shall conform to the plans dated January 8, 2009 (which showed the construction of

---

[2] Despite this assurance, it is now clear that there are multiple employees at the Property, who are required to use portable toilets, since there are no indoor facilities or even no running water at the Property.  (Exhibit 8, pp. 98-99).

<u>two</u> steel frame structures to contain the operation) and that Marchese "shall comply with the requirements of the Everett Building Department" and "[v]iolation of any condition of this Decision may result in revocation of building permit by the Building Inspector." The Decision further mandated that "[a]ny amendments to the Site Plan or waiver of conditions contained within shall require the approval of the Planning Board." (Exhibit 15). Marchese admits that despite this requirement, and although he never constructed the second structure on the Property, he has not amended the Site Plan Decision for the Property. (Exhibit 5, p.122, ll. 7-19).

28.  In addition, Wentworth has never applied for a Special Permit to operate a junk yard or materials recycling facility under Section 27. (Exhibit 5, p. 130, ll. 10-14; Exhibit 4, ¶18).

## IV.  <u>THE SCRAP-IT OPERATION AT THE PROPERTY</u>

29.  As noted above, Minichiello Brothers operates the scrap metal plant on the Property (as well as at Dexter Street in the City and another location in New Hampshire) under the business name of Scrap-It. (Exhibit 8, p. 9, ll. 1-23).

30.  Scrap-It takes in various metals, including gold, silver, platinum, palladium, aluminum, copper, steel and iron. (Exhibit 5, p. 56, ll. 3-13). Scrap-It also accepts refrigerators and junk cars at the site. (Exhibit 8, p. 56, ll. 18-20; p. 17, l. 22-p. 18, l.2).

31.  Tractor trailers, pick-up trucks and box trucks drop off scrap metal at the Property. (Exhibit 8, p. 15, l. 16-p. 17, l. 3).

32.  Scrap-It's operations include processing scrap metal when it comes into the Property, sorting and weighing the scrap metal and placing it the "bin or yard" to be processed.

After being processed, the scrap metal gets loaded on trucks and moved out. (Exhibit 8, p. 14, ll. 10-16; p. 15, l. 16-p. 16, l.8).

33. To effectuate this scrap metal operation, Scrap-It uses the following heavy power machinery at the Property: excavators, shears, material handlers, tractor trailer trucks, a "roll-off" (a truck that has a container on the back which can be dropped on the ground to be filled), box trucks, mechanic trucks, two larger balers, forklifts, Bobcats, loaders and hydraulic shears. The shears allow for size reduction of large items, including steel beams and poles, for shipping purposes. (Exhibit 8, pp. 34-35; p. 43, ll. 3-8; p. 45-46, p. 72, ll.1-3, pp. 87-94; Exhibits 16 and 17; Exhibit 5, p. 67, l. 13-p. 68, l.22; p. 69, ll.8-17).

34. Scrap-It sells the processed scrap metal in large bales to wholesale commodity traders. (Exhibit 5, pp. 65-66). These materials are sold in lots that average 30,000-40,000 pounds for sale to the traders. (Exhibit 8, pp. 38-40). It is not cost effective for Minichiello to send a tractor trailer to metal companies with smaller quantities than 30,000 or 40,000 pound lots. (Exhibit 8, p. 42, l.18-p. 43, l.2). As Minichiello testified, Scrap-It's operation is not retail—no one comes in off the street to buy bales of scrap metal. (Exhibit 8, p. 40, ll. 17-23).

35. Minichiello processes scrap metal at the Property in several ways, including through a baler, which compresses metal through the machine and forms the metal into large bales. This process is similar to large-scale trash compaction. (Exhibit 8, p. 53, ll. 1-23; Exhibit 18, ¶4, Exhibit A). The baler is a large machine kept outside in the yard on the Property. (Exhibit 8, p. 43, ll.3-6; Exhibit 16).

36. After a truck loaded with scrap comes into the Property, bulk items, including many non-ferrous materials such as iron and steel, are dumped outside, sorted and weighed. (Exhibit 8, pp. 60-62).

37. Metal items are then placed outside in concrete containment bins (an open top, four sided bin), which have no roof.  (Exhibit 8, p. 63, l. 16- p.65, l. 11).

38. These piles of material generally exceed the height of the "bins" that purportedly contain them.  (Exhibit 4, ¶8, Exhibit A; Exhibit 18, ¶4, Exhibit A).

39. Minichiello acknowledged that there are materials kept overnight in the open bins outside at the Property.  (Exhibit 8, p. 94, ll. 5-10).  Similarly, at the end of the day, there are bales of materials that have been processed but have not yet been loaded on trucks. (Exhibit 8, p. 95, ll. 11-21).  This testimony is supported by representative photographs of Property on various dates, which show large piles of baled and un-baled scrap metal stored after hours at various locations on the Property.  (Exhibit 4, ¶8, Exhibit A; Exhibit 18, ¶4, Exhibit A).

40. As Minichiello admitted, if Scrap-It finishes up at the end of the day at 4:30 it "doesn't make sense to bring [the baled piles] inside, move them around.  It's not cost efficient." (Exhibit 8, p. 96, ll.6-23).

41. Marchese also admitted that when you enter onto the Property you see various piles of materials, including refrigerators and air conditioners.  (Exhibit 5, p. 56, l. 14-p. 57, l. 10).  These significant piles have been documented in photographs of the Property from 2011-2012.  (Exhibits 19-21; Exhibit 18, ¶4, Exhibit A; Exhibit 4, ¶8, Exhibit A).

42. These piles can be substantially higher than that—sometimes 30 feet high or more. (Exhibit 4, ¶8, Exhibit A; Exhibit 18, ¶4, Exhibit A).

43.     Following the filing of this litigation, a higher fence was constructed to surround the
        Property.  (Exhibits 19-21; Exhibit 4, ¶8, Exhibit A; Exhibit 18, ¶4, Exhibit A).  This was
        <u>after</u> Field took the enforcement actions complained of in the plaintiff's Complaint.

## V.     ENFORCEMENT ACTIVITY INVOLVING WENTWORTH BY JOHN FIELD

44.     In April 2010, Field received a complaint regarding the condition of the Property,
        including the outdoor storage of large piles of junk and scrap.  (Exhibit 4, ¶7; Exhibit 3,
        p. 24, l. 2-p. 25, l. 18)

45.     When the City received a complaint regarding a particular property, it was investigated
        by Field or the City's ISD Inspectors.  (Exhibit 3, p. 17, ll. 9-18).  Field was primarily
        responsible for investigating zoning issues.  (Exhibit 3, p.18, ll. 3-11).

46.     Prior to receiving this complaint, Field was not familiar with the Property.  (Exhibit 3, p.
        25, ll. 15-18).

47.     Field's initial inspection of the Property occurred in April 2010.  (Exhibit 4, ¶7). Prior to
        this inspection, Field had no idea who Marchese was; he had never even heard of
        Wentworth or Scrap-It.  (Exhibit 3, p. 43, l. 20-p. 44, l. 2).

48.     During this initial inspection, Field observed heavy equipment, such as large excavators
        and balers operating outside at the Property.  Field also observed large piles of junk
        materials (approximately 30 feet high) close to the street frontage.  During subsequent
        inspections, he observed similar conditions; the piles of junk frequently contain discarded
        refrigerators and other appliances, and sometimes even automobiles.  These conditions
        are documented in representative photographs taken at the Property shortly after this
        litigation was initiated.  (Exhibit 4, ¶8, Exhibit A).

49.     One tool that Field used in conducting his professional activities was the preparation of an "action plan" to define objectives and track progress related to a given project or issue. On April 28, 2010, Field prepared an Action Plan to "get a handle on enforcement of what appeared to be violations of the zoning ordinance" for junk dealers in the City. (Exhibit 30; Exhibit 3, p. 23, ll. 2-14).

50.     During his investigation in 2010, Field found that Wentworth was not meeting its licensing restrictions relating to storage and operations inside the new building, landscaping, and employee parking. (Exhibit 3, p. 30, ll. 8-p. 31, l. 4). Field also determined these were zoning violations, because the Section 21 of the Zoning Ordinance required operations to be conducted inside a building. (Exhibit 3, p. 32, ll.14-33, l. 10; Exhibit 4, ¶10).[3]

51.     Field met with Frank Minichiello ("Minichiello") and Marchese in his office to discuss the complaint he had received regarding outside storage and operations at the Property. (Exhibit 3, p. 45, ll. 4-20).

52.     At the meeting, Minichiello proposed a plan to construct a large building on the Property to enclose the operation. (Exhibit 3, p. 46, ll. 1-5).

53.     Field did not speak with anyone in the Mayor's office in April or May 2010 regarding enforcement of the scrap metal facilities. (Exhibit 3, p. 40, ll. 15-20).

54.     On August 26, 2010, Field inspected the Property and issued an enforcement letter under Section 21 of the Zoning Ordinance for continuing to have "operations and storage of materials conducted outside of any buildings." (Exhibit 23; Exhibit 3, p. 47, ll. 1-24).

---

[3] Field did not realize at the time that the use of the Property began after the City adopted Section 27 of the Zoning Ordinance, which requires a special permit for junkyards and material recycling facilities. (Exhibit 4, ¶18; Exhibit 22).

55.     Field did not tell the Mayor or anyone else in the City that he was going to send the enforcement letter to Wentworth on August 30, 2010 and he testified that he "would have no reason to."  (Exhibit 3, p. 48, ll. 12-19).

56.     On August 30, 2010, Field issued an enforcement order for the Property.  (Exhibit 23; Exhibit 3, p. 12, ll. 13-15).  The enforcement order specifically references G.L. c.40A, §8, which allows such orders to be appealed to the City's Zoning Board of Appeals.  However, Marchese did not appeal the enforcement order.  (Exhibit 23; Exhibit 5, p. 147, ll. 8-20).

57.     Following another inspection of the Property, on October 19, 2010, Field sent a notice of violation to Wentworth.  (Exhibit 24; Exhibit 3, p. 46, ll.18-22).  In this violation, Field cited Wentworth for the continued storage of goods outside of the building.  He also determined that the use of the Property comprises heavy manufacturing, for which Section 21 requires a special permit from the Zoning Board of Appeals ("ZBA").  (Exhibit 3, p. 49, ll. 1-22).  Marchese does not claim (nor could he) that he appealed this order either.

58.     Field included the additional violation—i.e. that the use of the Property comprised a heavy manufacturing use, which required a special permit under Section 21 of the Zoning Ordinance—after he became more familiar with Scrap-It's operation.  In Field's opinion, after review of American Planning references, Wentworth's operation constituted "heavy manufacturing," based upon a variety of factors, including the use of large, heavy equipment and the enormous volume of materials being processed.  (Exhibit 3, p. 50, ll. 1-12; Exhibit 4, ¶11).  Field cited a number of objective indicators, including sight, sound, vibration and odors in support of his determination.  (Exhibit 3, p. 82, ll. 7-23).

Specifically, as Field testified, he concluded that the operation at the Property was heavy manufacturing because "it could be seen, heard and felt from well away from property lines, that it was processing materials at such a scale, that it was beyond what I could look at as light manufacturing. There was heavy equipment being used to process it, balers being used to compress it." (Exhibit 3, p. 88, ll. 5-13).

59. The October 19, 2010 letter was sent to all licensed ILD scrap metal operators. (Exhibit 4, ¶14).

60. The October 19, 2010 letter advised plaintiff and the other ILD scrap metal operators that further enforcement action would be stayed for one year, in order to give the recipients time to come into compliance with the Zoning Ordinance. (Exhibit 4, ¶22).

61. This stay of enforcement was at the direction of the Mayor's Chief of Staff, based upon the Mayor's desire to resolve disputes arising out of Field's enforcement actions— specifically the dispute with Wentworth/Scrap-It. (Exhibit 4, ¶22). Field was not in favor of the stay of enforcement. (Exhibit 24; Exhibit 3, p. 53, ll. 1-10).

62. After this litigation commenced, Field kept the Chief of Staff and City Solicitor's office apprised of developments related to enforcement at the Property, only because Wentworth had filed the lawsuit. (Exhibit 3, p. 107, ll. 2-8). No one in the Mayor's office ever asked Field to keep them apprised of ongoing enforcement regarding the Property. (Exhibit 3, p. 109, ll. 14-22).

63. On July 26, 2011, Field issued an enforcement order to Wentworth for expanding its operations onto the newly purchased butting land on Second Street—413 to 421 Second

Street—purchased subsequent to the filing of this litigation.  (Exhibit 25; Exhibit 3, p. 58, l. 20-p.59, l. 4; Exhibit 5, p. 131, ll. 8-13).[4]

64.     The July 26, 2011 enforcement order noted that operations began at this new site on July 25, 2011 and stated that the operation is in violation of Section 21 of the City's Zoning Ordinance.  (Exhibit 25; Exhibit 3, p. 62, ll.10-21).

65.     Field did not discuss the violations referenced in the July 26, 2011 order with anyone in the Mayor's administration before it was sent to Wentworth.  (Exhibit 3, p. 67, ll. 13-15).

66.     Throughout his enforcement efforts regarding the Property, Field has personally observed "large piles of material," which were "mostly metal" located "along the street, adjacent to the street along one of the property lines.  All over the lot."  (Exhibit 3, p. 78, ll. 9-21).

67.     After Field began enforcement against Wentworth in 2010 for its failure to comply with Article 21, he became aware that its operations also violated Article 27 of the Zoning Ordinance, which restricts the location of junk yards and recycling facilities in the City and requires such entities to apply for a special permit prior to operating.  Because of the pending litigation, Field did not take additional enforcement action against Wentworth under Article 27.  To date, however, Wentworth has not applied for a Special Permit or complied with the requirements of Article 27.  (Exhibit 4, ¶18).

68.     Field did not make enforcement or zoning decisions relative to the Property because he had an adverse opinion of Wentworth or anyone associated with the Property.  (Exhibit 3, p. 134, ll.11-15).  Field did not single out Wentworth/Scrap-It in his enforcement efforts.  Rather, he inspected all junk metal dealers in the Industrial Limited District to determine their compliance with Article 21.  (Exhibit 4, ¶13).

---

[4] This is the only one of Field's violation orders that plaintiff ever appealed to the ZBA. After the ZBA upheld the July 26, 2011 order, plaintiff filed a Superior Court appeal, pursuant to G.L .c.40A, §17, which is pending as Middlesex Superior Court, C.A. 2011-03583.

69. Field initiated zoning enforcement solely to address "violations that [his] job description require[d him] to address." (Exhibit 3, p. 205, ll. 5-23; Exhibit 4, ¶¶12-13).

70. Since March 2010, Field and the City have received numerous complaints (both in writing and by telephone) regarding the unsightly outside storage of junk at the Property. (Exhibit 4, ¶9).

71. The City received several complaints from abutters and citizens regarding Wentworth's operations at the Property. Abutters inquired of Field what the City's enforcement plan was regarding Wentworth. (Exhibit 26; Exhibit 3, p. 206, l. 23-207, l. 7; p. 208, ll. 3-5; Exhibit 4, ¶9).

72. Marchese admits that Field exhibited any personal animus toward him. (Exhibit 5, p. 156, l. 14-p. 157, l. 12).

73. Neither the Mayor nor any other administration official or City employee, dictated or influenced Field's decisions to pursue enforcement against Wentworth for violations of applicable zoning provisions. (Exhibit 4, ¶19). According to the Mayor, it is Field's ultimate decision as to whether or not something violates the City's zoning. Specifically, the Mayor testified that he has "no ability to enforce ordinances" and that he does not "interfere with the work of employees in the city; I don't do it. I'm not going to do it today, tomorrow or ever. I refrain." (Exhibit 1, p. 37, ll.11-24).

74. Significantly, the Mayor was not even aware of Field's determination to initiate such enforcement until after he had done so. (Exhibit 4, ¶20).

75. Rather, Field's conclusions that the operations at the Property violated the City's Zoning Ordinance, and his determination to undertake enforcement action based upon those

violations, were entirely his own and were not in any fashion whatsoever influenced by the Mayor, whom Field did not consult prior to initiating enforcement. (Exhibit 4, ¶25).

## VI.  OTHER PROPERTIES IN THE INDUSTRIAL LIMITED DISTRICT

76.  Plaintiff claims that it has been treated differently from other operations in the ILD. Each of the alleged comparators is addressed below.

### A.  M&S Metals

77.  M&S Metals ("M&S) is located at 39 Third Street in Everett, MA. It is a scrap metal business (Exhibit 3, p. 110, l. 21-111, l.9).

78.  M&S is not similarly situated to Wentworth, because M&S's operations are contained inside a building and their scale and volume is significantly less than Wentworth's. (Exhibit 3, p.111, l. 5-p. 112, l. 5).

79.  Field personally visited the M&S site to conduct inspections prior to the issuance of his October 2010 letter to all ILD scrap metal businesses, including M&S. (Exhibit 3, p. 111, ll. 11-15).

80.  Following these inspections, Field determined that M&S was not a heavy manufacturing operation because it lacked the receptor issues, including sight, sound and odor discernible outside the property, as noted above. (Exhibit 3, p. 112, ll. 11-23).

81.  Field also did not observe any piles of materials outside on the ground at M&S. During his inspection of the M&S facility, all operations were contained inside the building on its property. (Exhibit 3, p. 113, ll. 2-16).

82.  M&S operates by unloading a car or truck of scrap metal and then such materials will go into a container, which is immediately rolled into the building. (Exhibit 3, p. 113, l. 22-114, l. 9).

83. Moreover, Field discovered that the M&S operations predated the 1994 amendment to the ILD zoning requirements (i.e. the outdoor storage and special permit requirements), thus exempting M&S from complying with those requirements. (Exhibit 3, p. 116, ll. 17-21, p. 117 ll. 7-22; Exhibit 4, ¶15(a)).

84. Field does not know anyone personally involved in M&S and has not received any benefits from M&S. (Exhibit 3, p. 118, l. 23-119, l. 6).

85. Field never received any complaints regarding M&S. (Exhibit 4, ¶21).

### B. American Scrap Metal

86. American Scrap Metal ("ASM") is located at 357 3rd Street in Everett, Massachusetts. (Exhibit 3, p. 119, ll.9-11).

87. Field sent ASM the October 2010 enforcement letter. (Exhibit 3, p. 119, ll. 12-15).

88. On many occasions, Field observed that ASM was not storing anything outside its buildings. (Exhibit 3, p. 122, ll.11-17, p. 123).

89. Field did not make a final determination that ASM's operations constitute heavy manufacturing because it is a "smaller operation" and the balers and machines used at ASM are located inside its building. (Exhibit 3, p. 124, ll. 8-12).

90. Unlike Wentworth/Scrap-It, the City has not received any complaints about ASM; its storage is located inside of a building; and ASM has never had any restrictions on its licenses that they did not comply with. (Exhibit 3, p. 125, ll. 9-15; Exhibit 4, ¶21).

### C. HH&M Metals

91. HH&M is a scrap metal business, whose operations are smaller than Wentworth's, but similar to ASM. Field has observed HH&M's operations on dozens of occasions. (Exhibit 3, p. 138, ll. 1-11, 16-18).

92. Field also sent the October 2010 enforcement letter to HH&M. (Exhibit 3, p. 138, ll. 12-13).

93. HH&M, like ASM, takes material out of the back of cars and transports it to one of its two buildings. HH&M does have a storage pile in the rear of its property. (Exhibit 3, p. 139, ll.19-24).

94. However, HH&M is also a preexisting, nonconforming ("grandfathered") use, since it has been in operation since the 1970's, long prior to the City's Zoning Ordinance amendment in 1994. (Exhibit 3, p. 141, ll. 5-13; Exhibit 4, ¶15(b)).

95. Field never received any complaints regarding HH&M. (Exhibit 4, ¶21).

### D. **Mattuchio Metals, Inc.**

96. Mattuchio Metals, Inc. ("Mattuchio") is located in the ILD and, therefore, is subject to Article 21 Zoning Ordinance requirements. (Exhibit 4, ¶15(d)).

97. Mattuchio's customers bring material to the side of the building, unload it into storage bins and the material gets transported to a scale and weighed, then it is dumped into a specific pile of that material underline inside the building. Mattuchio also has a scale for larger vehicles where material is segregated and at the end of the day all material is brought inside the building or transported off site. (Exhibit 3, p. 157, ll. 2-11).

98. Field has conducted dozens of inspections and observations of Mattuchio's operations. (Exhibit 3, p. 156, ll. 1-3).

99. In the spring of 2010, Field observed piles of scrap on the front of Mattuchio's property in violation of Article 21. As a result, he issued it a verbal warning and then a written warning on October 17, 2011. (Exhibit 3, p. 156, ll. 7-20, p. 162, ll. 9-16; Exhibit 4, ¶15(d)).

100. Mattuchio complained that it had only begun to store piles outside because the plaintiff had been allowed to get away with doing so and it was unfair for a competitor to be allowed to violate zoning without consequence. (Exhibit 4, ¶15(d)).

101. Nevertheless, after Field issued the written warning in 2011, Mattuchio came into compliance and no longer has materials stored outside of its building. (Exhibit 3, p. 156, l.21-157, l. 2).

102. As of April 29, 2011, Field observed that Mattuchio's yard was "neat, no piles of materials were present and the operator made note of the difference between the Mattuchio operation and Wentworth." (Exhibit 3, p. 161, ll. 12-22).

103. In fact, following Field's written warning, Mattuchio has ensured that its operations were contained completely inside its building. (Exhibit 4, ¶15(d)).

104. Field never received any complaints regarding Mattuchio. (Exhibit 4, ¶21).

**E. Woodwaste**

105. Woodwaste is also located in the ILD. Unlike Wentworth, it does not process scrap metal; it processes construction and demolition materials (such as wood and drywall) and Field did not classify its operations as "heavy manufacturing." (Exhibit 3, p. 191, ll. 7-20; p. 193, ll. 5-6).

106. Following Field's review of relevant documents and conducting inspections of its property, he determined that Woodwaste is not the same type of business as the other scrap metal dealers in the ILD. Woodwaste processes construction and demolition material, not metal. (Exhibit 4, ¶16).

107. Woodwaste is subject to a Site Assignment issued by the Massachusetts Department of Environmental Protection ("DEP"). Accordingly, Field determined that Woodwaste was exempt from zoning enforcement pursuant to G.L. c. 40A, §9 (19th par.) (Exhibit 4, ¶16).

108. Moreover, Woodwaste is also subject to a Settlement Agreement with the City's Board of Health, which governs its operations and enforcement. (Exhibit 27, ¶3, Exhibit A).

**F. Scrap Metal Operators in the Industrial District Not the Industrial Limited District**

109. Second Street Iron and Steel is located in the Industrial District not the ILD, and therefore, is not subject to Article 21 or Article 27 of the City's Zoning Ordinance. (Exhibit 3, p. 147, ll. 3-11; Exhibit 4, ¶17). Field never received any complaints regarding Second Street Iron and Steel. (Exhibit 4, ¶21).

110. Scrap-It's Dexter Street location and Schnitzer Polarizer are also located in the Industrial District not the ILD, and, therefore are not subject to Article 21 or Article 27 of the City's Zoning Ordinance. (Exhibit 3, p. 149, ll. 13-18; Exhibit 4, ¶17)).

111. According to the Mayor, Second Street Iron and Steel is a "disaster" and a "mess." Like Wentworth/Scrap-It, Second Street Iron and Steel is not in an enclosed facility. Unlike Wentworth, however, the Board of Alderman denied Second Street Iron and Steel's license renewal in 2012. (Exhibit 1, pp. 85-86).

**VII. THE MAYOR'S POLITICAL CAMPAIGN**

112. All contributors to the Committee to Elect Carlo DeMaria are listed on Campaign Finance Reports. (Exhibit 1, p. 206, l.24-p. 207, l. 24).

113. Marchese donated $250.00 to the Committee to Elect Carlo DeMaria on May 12, 2008. (Exhibit 28; Exhibit 5, p. 161, ll. 2-21; Exhibit 2, ¶13). Marchese's family members,

including his brother Michael Marchese, also donated to the Mayor's campaign. (Exhibit 5, pp. 161-162; Exhibit 2, ¶13).

114. Frank Minichiello and his wife, Tanya Minichiello, also donated to the Committee to Elect Carlo DeMaria on May 13, 2008. (Exhibits 28).

115. Marchese testified that he probably has been solicited for donations by "just about every mayoral candidate in the past 20 or 30 years." (Exhibit 5, p. 197, ll. 4-7).

116. Michael Marchese also attended a fundraiser for the Mayor in 2008. (Exhibit 1, p. 130, l. 4-13).

117. The Mayor has never discussed campaign contributions with Mr. Field. (Exhibit 2, ¶11).

118. Field never heard Joseph Marchese or his brother Michael Marchese's name mentioned in conjunction with the Mayor's recent reelection campaign—the only campaign during which he was a City employee. (Exhibit 3, p. 171, ll. 13-22). Field never spoke with the Mayor regarding campaign contributions made to his campaign by Wentworth, Scrap-It or its manager, Joseph Marchese, Jr. Prior to this case, and his review of the Complaint filed by Wentworth, he was not even aware of who made political contributions to the Mayor's campaign. (Exhibit 4, ¶24).

## VIII.  <u>NO ALLEGATION OF DAMAGE</u>

119. Wentworth is sole plaintiff in this case. (Complaint, ¶1).

120. Wentworth does not own the Property. Rather, the property is owned by two other Limited Liability Companies. (Exhibit 5, pp. 11-13)

121. Wentworth does not own, operate or receive any compensation from Scrap-It. (Exhibit 5, pp. 11-13; p. 33, ll. 8-12).

122.    Furthermore, Wentworth has never complied with any of Field's enforcement orders. Indeed, this action was filed during the one-year stay of enforcement provided in Field's enforcement letter of October 19, 2010.  (Exhibit 4, ¶18, Complaint, p.18).

123.    The City has been awaiting the outcome of this litigation to determine how to proceed with further enforcement actions.  (Exhibit 4, ¶18).

124.    Wentworth has not identified any damages as a result of the enforcement letters issued by Field.

125.    Wentworth does not allege that it or any related entity has ever paid any fines as a result of Field's enforcement action, that Scrap-It has ever ceased or altered its operations as a result of the enforcement action, or that Scrap-It has ever paid less rent as a result of the enforcement action.

DEFENDANTS,

CITY OF EVERETT, CARLO DeMARIA, JR., FRANK NUZZO AND JOHN FIELD,

By their attorneys,

/s/ Jonathan M. Silverstein
Jonathan M. Silverstein (BBO# 630431)
Janelle M. Austin (BBO# 666835)
Kopelman and Paige, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
jsilverstein@k-plaw.com
jaustin@k-plaw.com

CERTIFICATE OF SERVICE

I, Jonathan M. Silverstein, certify that the above document and its exhibits will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be served upon any party or counsel of record who is not a registered participant of the Court's ECF system upon notification by the Court of those individuals who will not be served electronically.  /s/ Jonathan M. Silverstein

446966.6/METG/0950