UNTIED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

WENTWORTH PRECIOUS METALS, LLC,

Plaintiff

vs.

C.A. NO. 11-CV-10909-DPW

CITY OF EVERETT, CARLO DeMARIA,
JR., as he is the Mayor of the City of Everett,
FRANK NUZZO, as he is the Code Enforcement
Officer of the City of Everett, and JOHN FIELD,
as he is the Building Inspector of the City of
Everett,

Defendants

---

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

Although the Defendants attempt to paint this case as a run-of-the-mill zoning-

dispute-cum-civil-rights-action (from which, Defendants protest, the Federal Judiciary

must be protected), the reality is just the opposite. This is a case about power -- the

power of the current Mayor of Everett ("Mayor DeMaria") to punish former Everett

Board of Aldermen member Joseph Marchese ("Marchese") because Marchese declined

to support the Mayor's candidacy and administration, both monetarily and by refusing to

provide the public endorsement the Mayor sought from him. In other words, as the

Mayor himself put it to Marchese, because Marchese refused to "get on board." Indeed,

1

those who have dutifully "gotten on board" with the Mayor have avoided unfavorable treatment, and in some instances have enjoyed incredibly generous and lucrative benefits from the City.

Without disputing these allegations, Defendants seek shelter in the time-tested defense of plausible deniability. The Defendants try to position former Everett Inspector of Buildings and Zoning Enforcement Officer John Field ("Field") as a lone operative, who acted without any knowledge whatsoever on the part of the Mayor and his administration that he was pursuing a myriad of zoning infraction allegations, licensing obstructions, and adverse determinations against Marchese and entities owned by him. But, as explained below, the factual record tells a very different story.

## FACTS

The Defendants' factual recitation ignores most of the adverse actions and determinations taken by the City against entities owned by Marchese, including Plaintiff Wentworth Precious Metals, LLC ("Wentworth"). While it is true that Wentworth is the only plaintiff here, the actions relating to other Marchese-owned and controlled entities is part of the City's pattern of retaliation and hostile conduct. Moreover, as to Wentworth itself, the Defendants most notably ignore the hostile actions taken by Field before the Everett Board of Aldermen relating to Wentworth's licensing, which *is* an aspect of the claims alleged in this case.

Like Defendants, Plaintiff relies on its Local Rule 56.1 Statement of Material Facts ("Pl.'s SOF"), and its responses to Defendants' Local Rule 56.1 Statement of Material Facts ("Pl.'s Resp. to Defs.' SOF"). Plaintiff also provides the following timeline of some of the relevant events, with citation to the record:

2

| 2007 | Running for Mayor for the first time, DeMaria asks for the public endorsement and support of Marchese, who instead publicly supports DeMaria's opponent. | Pl.'s SOF ¶ 13 |
|---|---|---|
| November 2007 | Mayor DeMaria is elected. | Defs.' SOF ¶ 1 |
| May 12, 2008 | For the first and only time, Marchese attends a DeMaria fundraising event and donates to his campaign, as a favor to Marchese's friend who is holding the event. | Pl.'s SOF ¶ 17 |
| 2008 | Wentworth first receives licenses to operate at the Second Street Property. The Building Department confirms zoning compliance. | Pl.'s SOF ¶¶ 10, 11 |
| 2008-2010 | Marchese is on numerous occasions solicited to provide money to the Mayor's campaigns. He refuses. | Pl.'s SOF ¶ 16 |
| March 15, 2010 | The Building Department confirms zoning compliance for Wentworth's 2010 license renewals | Pl.'s SOF ¶¶ 10, 11 |
| March 2010 | Building Inspector Field is hired. Field is the first Building Inspector appointed by Mayor DeMaria's administration. | Defs.' SOF ¶ 7<br>Pl.'s SOF ¶ 11 |
| August 30, 2010 | Despite the confirmation of zoning compliance made five months earlier by the Building Department, Marchese receives a letter alleging that the Second Street Property is not in compliance, because material is being "stored" outside. No change had occurred in the operations during that time. | Pl.'s SOF ¶¶ 18, 19 |
| October 19, 2010 | Wentworth, along with the other scrap metal recyclers in the Industrial Limited District, receives a letter alleging that the operations on the Second Street Property constitute "heavy manufacturing" and require a special permit, but staying enforcement for one year. | Pl.'s SOF ¶ 21;<br>Defs.' SOF ¶ 59 |
| November 2010 | Wentworth is issued citations for the alleged violations. The hearings are continued. | Pl.'s SOF ¶ 22 |
| December 2010 | At a Board of Aldermen licensing hearing, Field takes the position that a separate Marchese-owned property is not in compliance. **Afterward, Mayor DeMaria approaches Marchese in City Hall and says to Marchese, "it looks like you're having a hard night tonight." Mayor DeMaria then says to Marchese, "Your problem is you should get on board" and "start to attend** | Pl.'s SOF ¶¶ 23-25 |

| | | |
|---|---|---|
| | my fundraising events," and that if Marchese did so "everything goes away." | |
| November or December 2010 | At a meeting with Frank Minichiello, Mayor DeMaria screams, "The problem is that fucking Joe Marchese! You tell Joe Marchese to go fuck himself!" Afterward, Field tells Minichiello that "Marchese's got to go. That's the problem." | Pl.'s SOF ¶¶ 26, 27 |
| March 2011 | Field opposes renewal of Wentworth's licenses before the Board of Aldermen. However, despite the fact that the other metal recyclers in the zoning district received the same October 19, 2010 letter alleging that their operations constitute disallowed "heavy manufacturing," Field and the Building Department do not oppose the renewal of any of their licenses on that or any other grounds. | Pl.'s SOF ¶¶ 28-31 |
| 2007-2011, various dates | The principals of all of the other metal recyclers whose licenses, unlike Wentworth's, were not opposed by the Building Department consistently contribute money to the Mayor's campaign fund. | Pl.'s SOF ¶ 37 |
| May 2011 | Marchese is at City Hall to pay for and pick up his license renewals at the City Clerk's Office. Mayor DeMaria approaches Marchese and says to him that he (the Mayor) has the power to "make everything go away," and that Marchese "doesn't know the name of the game." Mayor DeMaria also threatens to take Marchese's real estate by eminent domain. | Pl.'s SOF ¶ 35 |
| July 26, 2011 | Field issues a Cease and Desist Order relative to part of the Second Street Property. The Order is appealed to the Everett Zoning Board of Appeals and subsequently to Middlesex Superior Court. | Pl.'s SOF ¶ 36 |

## ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998). If, when viewed in a light most favorable to the nonmovant, a rational factfinder could resolve an issue in favor of either party, then the issue is "genuine," Borges v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010), and issues of credibility may not be resolved on summary judgment. Dominguuez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000).

## II.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM MUST BE DENIED.

In order to succeed on its Section 1983 retaliation claim (Count I), Plaintiff must show: (1) that after engaging in constitutionally protected conduct, (2) it suffered an adverse action, and (3) that retaliation for the constitutionally protected conduct was a motivating factor for that adverse action. Barton v. Clancy, 632 F.3d 9, 23 (1st Cir. 2011); see also Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 41 (1st Cir. 1992).

### A.  Monetary Support And Public Endorsement Of A Political Candidate Or Elected Official Is A Constitutionally Protected Activity -- As Is The Withholding Of Same.

Defendants pay scant attention to this element of the claim. Indeed, campaign contributions are a form of protected speech. Buckley v. Valeo, 424 U.S. 1 (1976).

Likewise, the right to be free from compelled speech is constitutionally protected. <u>Riley</u> <u>v. Nat'l Fed'n of the Blind</u>, 487 U.S. 781 (1988).

Here, Plaintiff alleges that the actions taken by the City against it -- as well as against other Marchese entities -- have been in retaliation: a) for Marchese's refusal to publically endorse Mayor DeMaria, and b) for Marchese's refusal to contribute to the Mayor's campaign fund. Marchese's public support of the Mayor would have been of great value to the Mayor given Marchese's 22-year membership on the Board of Aldermen and Common Council, his continued involvement in city politics, and his brother's current membership on the Board of Aldermen. (Pl.'s SOF ¶ 13; Marchese Aff. (Pl.'s Ex. 1), ¶ 2). Marchese's right to choose which candidate to support, to refuse to support the Mayor, and to refuse to monetarily contribute to the Mayor are all constitutionally protected activities.

It is unclear why the Defendants focus on the fact that Marchese did make one $250.00 contribution to the Mayor's campaign fund -- *over two years* before the adverse actions from the City commenced. It was only when Marchese would not contribute again, including relating to the 2009 election, and continued to oppose the Mayor politically that the City began its campaign against him. (Pl.'s SOF ¶ 11). In any event, on that lone instance Marchese attended a fundraising event not to benefit the Mayor, but in support of a friend who was holding the fundraiser. (Pl.'s SOF ¶ 17). It was in no way meant to imply a change in Marchese's public opposition to the Mayor, a fact of which the Mayor was well aware. <u>Id.</u>

**B.**     **Plaintiff Has Suffered A Host Of Adverse Actions.**

Defendants' argument the Wentworth has suffered no "adverse action" is nonsensical, and based on an entirely too narrow presentation of that element of the test. Indeed, there have been three types of adverse actions against Wentworth: 1) Determinations that supposed "outside storage" at the Second Street Property constitutes a zoning violation, including the July 26, 2011 Cease and Desist Order issued by Field; 2) Attempts to block Wentworth's license renewals before the Board of Aldermen; and 3) Issuance of citations. (Pl.'s SOF ¶¶ 18, 19, 22, 28, 40). All are clearly "adverse actions" taken against Wentworth.

Defendants' argument that Wentworth has not suffered "adverse action" as a result of the alleged "outside storage" zoning violations ignores the fact that Scrap-It operates on the Second Street Property pursuant to a lease <u>and</u> an Operating Agreement by which Scrap-It operates under the Wentworth licenses. (Pl.'s SOF ¶ 7)[1]. The acts of the City put at risk Scrap-It's (or any entity's) ability to operative under the licenses at the Second Street Property at all, and therefore jeopardize the entire value of the Wentworth licenses. (Pl.'s SOF ¶ 40). And clearly, the efforts by Field to block Wentworth's license renewals, and the citations Field issued, obviously are acts adverse to Wentworth.

Furthermore, Defendants cite no support for their argument that Wentworth has suffered no "adverse action" simply because Wentworth preemptively brought suit to vindicate its rights, and because the Everett Board of Aldermen has seen through the Building Department's specious attempts to block Wentworth's license renewals. The lone case Defendants cite in support of their argument on this point is entirely inapposite -- in that case, a prison inmate complained about a transfer that he himself had requested,

---

[1] Defendants misstate the relationship between Wentworth and Scrap-It in their Statement of Facts, ¶ 121.

to a situation that was no worse than the one he had been in. Price v. Wall, 464 F. Supp. 2d 90, 97 (D.R.I. 2006). [2]

## C. "Get On Board" and "Everything Goes Away" -- A Jury Must Decide Whether There Is A Connection Between These Statements Made By The Mayor and Field's Actions.

This is where the Defendants circle the wagons. Marchese has testified that the Mayor told him: "Your problem is you should get on board" and "start to attend my fundraising events," and that if Marchese did so "everything goes away." (Pl.'s SOF ¶¶ 23-25). Frank Minichiello has testified that the Mayor told him, "The problem is that fucking Joe Marchese! You tell Joe Marchese to go fuck himself!", and that Field told Minichiello that "Marchese's got to go. That's the problem." (Pl.'s SOF ¶¶ 26-27). Marchese has also testified that the Mayor threatened to take his properties by eminent domain, and told Marchese that he "doesn't know the name of the game." (Pl.'s SOF ¶ 35). In response, the Defendants in essence say, "Even if the Mayor and Field did make these statements, the Plaintiff cannot prove that that they are related to Field's actions." But there will almost never be a smoking gun in cases such as this. How often will a civil plaintiff, without the power of a criminal investigation, uncover a whistleblower or other insider willing to expose a pattern of conduct granting favorable treatment to those who support a candidate or elected official, and retaliation against those who do not? In this context, as explained below, there is more than sufficient evidence to satisfy the summary judgment standard on this point.

---

[2] It may be that Defendants confuse the issue of "adverse action" with the amount of Plaintiff's monetary damages. But see Pl.'s Resp. to Defs.' SOF ¶¶ 119-125. In addition, Section 1983 also allows punitive and nominal damages, and injunctive relief. Tapalian v. Tusino, 377 F.3d 1 (1st Cir. 2004); Davet v. Maccarone, 973 F. 2d 22 (1st Cir. 1992).

8

## 1. The Statements Made By The Mayor And Field

Why would the Mayor tell Marchese, "it looks like your having a hard night tonight" after Field attempted to block Marchese's license renewal, then tell Marchese that, "Your problem is you should get on board" and "start to attend my fundraising events," and that if Marchese did so "everything goes away," if the Mayor did not actually have the power to make everything go away by instructing Field's actions? They were not idle threats -- the only explanation is that the Mayor meant exactly what he said to Marchese. (Pl.'s SOF ¶¶ 23-25). Moreover, it is important to note that these statements were made before this lawsuit was filed. Thus, the "everything" must be interpreted to mean all the issues Marchese was having with the City at the time, both regarding Wentworth and otherwise. Id.

There is also direct evidence linking Field to the Mayor's efforts of retaliation. Not only did the Mayor tell Minichiello, "The problem is that fucking Joe Marchese! You tell Joe Marchese to go fuck himself!" and, "Fuck him. You tell him for me," but Field himself, ***on that same occasion***, told Minichiello that "Marchese's got to go. That's the problem." (Pl.'s SOF ¶¶ 26-27). The purpose of the statement is clear: although the Mayor had no issue with Minichiello, Minichiello's Second Street operation would continue to have problems with the City until the time Marchese -- the owner of the Second Street licenses and land -- "went."[3]

Furthermore, the Mayor admitted at his deposition that he has ultimate control over how Field enforces the Zoning Ordinance, and that he can, and does, direct Field to

---

[3] The Defendants confirm that this meeting with Minichiello took place -- but of course tell a very different story about what happened during it. (Field Depo. Tr. (Pl.'s Ex. 8), p. 99).

do so. (Pl.'s Resp. to Defs.' SOF ¶ 9, citing DeMaria Depo. Tr. (Pl.'s Ex. 4), p. 33, l. 6 –

p. 34, l. 12).

### 2. The Favorable Treatment Given To Other Metal Recyclers Who Do Support The Mayor

The following facts are undisputed:

- On October 19, 2010, Field sent a letter to Wentworth and all of the other scrap metal recyclers in the district, alleging that they needed a permit for "heavy manufacturing," but staying enforcement for one year as to all. (Pl.'s SOF ¶¶ 21, 31; Defs.' SOF 59).

- In March 2011, Field opposed the renewal of Wentworth's licenses before the Board of Aldermen, due to the "heavy manufacturing" allegation. (Pl.'s SOF ¶ 28).

- Unlike Wentworth, Field and the Building Department did not oppose the renewal of licenses for any of the other metal recyclers in 2011, all of whom got the same October 19, 2010 letter. (Pl.'s SOF ¶¶ 29-31).

- Unlike Wentworth, the principals of all of the other metal recyclers routinely contribute to the Mayor's campaign fund, attend his fundraising events, and/or have held fundraising events for him. (Pl.'s SOF ¶ 37).

Moreover, Field has not taken enforcement action relating to the outside presence

of metal in piles at any of the metal recyclers who support the Mayor (although the facts

relative to this issue are disputed in the summary judgment record). (Pl.'s SOF ¶¶ 32-34;

Pl.'s Resp. to Defs.' SOF ¶¶ 81, 82, 88, 90, 93, 97, 101-103).

This point necessarily overlaps with the equal protection/selective enforcement

issue discussed in Section III., *infra* -- but the favorable treatment given by Field and the

Building Department to all of the metal recycling business whose principals support that

Mayor, without any distinction from Wentworth other than the fact that Marchese does

not support the Mayor, is additional evidence which could lead a reasonable jury to

conclude that there exists an inescapable link between the two.

### 3. The Pattern Of Favorable Treatment Given To Other Businesses In The City Who Contribute Money To The Mayor

The pattern of favorable treatment given to businesses and individuals that contribute money to the Mayor's campaign fund extends beyond the metal recyclers in the City. For example, in 2011, the Mayor extended the contract of Capitol Waste Services, Inc., without putting it out to bid. (Pl.'s SOF ¶¶ 14-15). The extension was for five years in an approximate amount of $8 million. (Pl.'s SOF ¶ 15). The original Capitol Waste contract had been put out to bid by the City prior to Mayor DeMaria's administration. (Pl.'s Ex. 5). The extension was signed by the Mayor on February 4, 2010 (over one month after execution by the other parties), and shortly after a fundraising event was held by the principals of Capitol Waste which raised approximately $30,000 for the Mayor. (Pl.'s SOF ¶¶ 14-15). The principals of Capitol Waste also routinely contribute to the Mayor's campaign fund. Id. The City has also extended the contacts of other businesses and entered into favorable transactions with businesses and individuals who have contributed to the Mayor's campaign fund and/or have held fundraising events for him. (Pl.'s SOF ¶ 38).

### 4. A Reasonable Jury Could Find A Retaliatory Motive

This is not a case of a plaintiff alleging that an isolated instance should be sufficient to lead to a plausible inference of retaliatory motive. To the contrary, as set forth above, there is a long pattern of occurrences that leads to such an inference -- with one of the factors, the direct statements of the Mayor and Field to Marchese and Minichiello -- being resoundingly powerful. Even without the availability of a witness willing to testify directly to a link between the Mayor's retaliatory animus and Field's

actions, there is sufficient evidence by which a reasonable jury could conclude that the Mayor, via Field, set out to retaliate against Marchese.

Cases involving bribery and other misconduct of public officials are instructive. For example, in U.S. v. Siegelman, 640 F.3d 1159 (11th Cir. 2011), the Eleventh Circuit Court of Appeals upheld a conviction even without direct evidence of an explicit unlawful agreement, holding that, "In the absence of a defendant's confession or observation of his wrongdoing by a third person, proof by circumstantial evidence and the fair inferences to be drawn therefrom is both necessary and permissible." Id. at 1180. This, the Court held, prevented wrongdoing from going unpunished via the use of "'knowing winks and nods.'" Id. at 1171 (quoting Evans v. U.S., 504 U.S. 255, 274 (1992) (Kennedy, J., concurring). In U.S. v. DiMasi, 810 F.Supp. 2d 347 (2011), the Court held that, "[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions," id. at 353 (internal quotation omitted), and, "[A]n unlawful agreement to commit honest services fraud need not be express, but can be proven by inference, based on circumstantial evidence." Id. at 355. Likewise here, there can be no doubt that relevant communications between the Mayor and Field would not be memorialized -- and if a reasonable jury may infer guilt in a criminal bribery or similar case without direct evidence, then certainly, given all of the evidence here, a reasonable jury could infer that the actions against Wentworth have been motivated by retaliation.

### D. A Jury Must Decide If Field's Alleged Rationale Was A Pretext For Retaliation.

As an initial matter, it is important to point out three misstatements of law made by the Defendants on this point.

First, it is not accurate that Defendants prevail on summary judgment merely by proposing a legitimate, non-retaliatory reason for the government action to rebut the prima facie case of retaliation that the Plaintiff has clearly presented (as set forth above). To the contrary, Plaintiff "can survive summary judgment by raising 'an arguable question of pretext.'" Welch v. Paicos, 66 F. Supp. 2d 138, 171 (D. Mass. 1999) (quoting Nestor Colon, 964 F.2d at 41)).

Second (and although not really relevant to the instant issues), Plaintiff is not estopped from taking the position that there has been no violation of Section 21(a)(5) of the Everett Zoning Ordinance, because the August 30, 2010 letter from Field was on its face not a Cease and Desist Order which must be appealed to the Zoning Board of Appeals within the statutory time period. Frank's Towing, Inc. v. Zoning Board of Appeal of Lowel, 76 Mass. App. Ct. 1132 (2010). It was merely a warning of further action. (Defs.' Ex. 23). And in any event, when Field did issue a Cease and Desist Order for the part of the Second Street Property owned by Marchese Realty, LLC, that was appealed to the Everett Zoning Board of Appeals, and the question of interpretation of Section 21(a)(5) is now pending before the Middlesex Superior Court. (Defs.' SOF ¶ 63).

Which leads to the third: Section 21(a)(5) is far from the ideal of clarity that Defendants make it seem. It is pervaded with ambiguity in several respects, including, *inter alia*, whether or not the outdoor material-in-process at the Second Street Property

13

meets the definition of "storage" (see, e.g., Mahoney v. City of Chelsea, 20 Mass. App. Ct. 91 (1985)); whether or not the material-in-process constitutes "raw materials" exempt form the restrictions of Section 21(a)(5); and whether or not Section 21(a)(5) even applies in a situation where "storage" is not the only thing occurring on a property. (Defs.' Ex. 6). Furthermore, Defendants leave out altogether a discussion of "heavy manufacturing," which is equally ambiguous under the Ordinance.

Thus, the crux of the wrongful conduct here has to do with application by Field of an ambiguous Ordinance, not an unambiguous one. Plaintiff alleges that Field "interpreted" and then applied the Zoning Ordinance one way -- both as to "outside storage" and "heavily manufacturing" -- for Wentworth, and another way for the metal recyclers who support and contribute money to the Mayor's campaign fund. Therefore, even if theoretically Field's actions could have mirrored a legitimate and not entirely unreasonable interpretation of the Ordinance, they are unlawful if merely a pretext for retaliation: It is of course true that, "[The Court] cannot allow [a] plaintiff to survive summary judgment simply because his protected expression preceded negative results." *However:*

> On the other hand, [the Court] must avoid concluding that a decision is constitutionally supportable simply because it could have a permissible rationale. Indeed, even a government decision partly based on permissible factors must fall if materially informed by unconstitutional retaliatory animus.

Welch, 66 F. Supp. 2d at 171 (emphasis added, internal citation omitted).

Directly applicable to this case,

> The First Circuit has held that retaliation claims turn largely on defendants' state of mind, and that when "an

14

inference of retaliation is <u>warranted from the chronology of
events recited</u>," especially when combined with other
evidence, summary judgment should be denied and the case
should proceed.

<u>Id.</u> (quoting <u>Ferranti v. Moran</u>, 618 F.2d 888, 892 (1st Cir. 1980))
(emphasis added).

To summarize again, in part, the chronology of events here:

- For years Marchese has no zoning or licensing issues with
Wentworth or any of his properties or businesses.

- In 2007 the Mayor is first elected, without the public
support of Marchese he sought.

- After May 2008, Marchese refuses to contribute to the
Mayor's campaign fund.  The other metal recyclers
continue to contribute.

- In March 2010 Field is hired and appointed by the Mayor's
administration.

- The adverse actions by Field start almost immediately.

- In December 2010 the Mayor tells Marchese he should,
"get on board" and "everything goes away."  Marchese
refuses.

- The Mayor tells Minichiello, "The problem is that fucking
Joe Marchese!  You tell Joe Marchese to go fuck himself!"
and at the same meeting Field tells Minichiello,
"Marchese's got to go. That's the problem."

- In March 2011 Field attempts to block Wentworth's license
renewals.

- In May 2011 Mayor DeMaria tells Marchese that he (the
Mayor) has the power to "make everything go away," and
that Marchese "doesn't know the name of the game," and
threatens to take Marchese's property by eminent domain.

(<u>See</u> pp. 3-4, *supra*, for relevant citations to the record).

Based on all of the above, Plaintiff has clearly met its summary judgment burden on its retaliation claim, and the claim should proceed to trial. [4]

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S EQUAL PROTECTION CLAIM MUST BE DENIED.

In order to prevail on its equal protection claim (Count II), Plaintiff must show: (1) that is was selectively treated compared with others similarly situated, and (2) that the selective treatment was based on an impermissible consideration such as race, religion, intent to inhibit or punish the exercise of constitutional rights <u>or</u> malicious or bad faith intent to injure. <u>Tapalian v. Tusino</u>, 377 F.3d 1, 5 (1st Cir. 2003).

### A. By Defendants' Own Admissions, Plaintiff Is Similarly Situated With Other Metal Recyclers That Were Treated Differently.

There are four other metal recyclers in the Industrial Limited District: HH&M Metals, Inc.; M&S Metals, Inc; American Scrap Metal; and Paul Mattucchio, Inc. (Pl.'s SOF ¶¶ 29-30; Defs.' SOF ¶¶ 77-104). The most glaring difference between the Plaintiff and all of them is that their principals all contribute money to the Mayor, while Marchese does not. (Pl.'s SOF ¶ 37). But putting that aside, Defendants' efforts to distinguish them from Plaintiff are just so many angels dancing on the head of a pin. In fact, both the Mayor and Field admitted at their depositions that the other metal recyclers in the district

---

[4] In their Statement of Facts and Memorandum of Law, Defendants pay much attention to statements made by Marchese before the *Planning Board* when he obtained site plan approval, which have nothing to do with the issues in this case. In any event, although approval was granted to build two buildings, there was nowhere a requirement that two buildings be built on the Second Street Property, nor does the existence of any number of buildings on the Property have anything to do with the application of the Zoning Ordinance by Field. (Pl.'s Resp. to Defs' SOF ¶¶ 19-27).

are all in the same business as Plaintiff. (Pl.'s SOF ¶ 30). They all make money the

same way, by buying scrap metal and then reselling it. Id.

> The test is whether a prudent person, looking objectively at
> the incidents, would think them roughly equivalent and the
> protagonists similarly situated. Much as in the lawyer's art
> of distinguishing cases, the "relevant aspects" are those
> factual elements which determine whether reasoned
> analogy supports, or demands, a like result. Exact
> correlation is neither likely nor necessary, but the cases
> must be fair congeners. In other words, apples should be
> compared to apples.

Tapalian, 377 F.3d at 6 (internal quotation omitted).

Moreover, they all were treated differently from Plaintiff, both before the Board

of Aldermen in regard to the "heavy manufacturing" issue (Pl.'s SOF ¶¶ 29-31); and by

classification of their operations as not involving disallowed "outside storage." (Pl.'s

SOF ¶¶ 32-34).

As to those two more specific aspects, Defendants' attempts to distinguish the

other metal recyclers also fails:

### 1. "Heavy Manufacturing"

On October 19, 2010, Field sent letters to all of the metal recyclers, claiming that

they were all "heavy manufacturing" operations that required a special permit. How can

the Defendants now claim that they are not similarly situated with the Plaintiff on this

point? Again, the only difference is that five months later Field tried to block

Wentworth's license based on the "heavy manufacturing" allegation, but the Building

Department confirmed the zoning compliance of the others before the Board of

Aldermen, thus treating them differently before the Board. (Pl.'s SOF ¶¶ 28-31).

17

## 2. **"Outside Storage"**

There are genuine issues of material fact as to whether or not there exist piles of scrap metal located outside at the other metal recyclers. (Pl.'s SOF ¶¶ 32-34; Pl.'s Resp. to Defs.' SOF ¶¶ 81, 82, 88, 90, 93, 97, 101-103). Summary judgment is therefore not appropriate on this point. Field and the Building Department have not taken any issue with the piles at those businesses, and did not oppose their license renewals on those grounds. (Pl.'s SOF ¶ 29, 34).

As to the issue of the so-called "grandfathering" of HH&M Metals and M&S Metals, Field only testifies that they were *licensed* prior to the enacting of Section 21(a)(5) of the Zoning Ordinance. (Pl.'s SOF ¶ 33). But the standard for "grandfathering" of a particular aspect of an alleged non-conforming use under Massachusetts law is whether or not that particular aspect of a nonconforming use existed prior to the zoning change, not whether, in broad terms, the property was used or licensed for a particular purpose. Powers v. Building Inspector of Barnstable, 363 Mass. 648 (1973). Therefore, in order for HH&M Metals and M&S Metals to be exempt form any provision that Field alleges governs the outside presence of piles of metal, the property at issue must have been used in that particular way prior to the enactment of Section 21(a)(5). Field has not so alleged, and stated at his deposition that he did not make such an investigation, despite the fact that the law requires it. (Pl.'s SOF ¶ 33). Therefore, HH&M Metals and M&S Metals cannot be distinguished from Wentworth based on so-called "grandfathering," and are -- even as to this specific point -- similarly situated to Plaintiff.

**B.    There Is Sufficient Evidence Of Improper Motive And
Animus To Defeat Defendants' Motion For Summary Judgment.**

There can be no question that Marchese's refusal to "get on board" and "play the game" would be an improper motive, under a constitutional analysis, for the differing treatment to which Plaintiff was subjected.  Plaintiff relies on and incorporates by reference its argument on this point at Section II., *supra.*

Likewise, there is clear evidence in the summary judgment record of a personal animus on the part of the Mayor toward Marchese, sufficient to satisfy the "maliciousness or bad faith intent to injure" element of the test.  Indeed, it is difficult to imagine a more clear indication of personal animus than the, "The problem is that fucking Joe Marchese!" and "You tell Joe Marchese to go fuck himself!" comments testified to by Minichiello.  (Pl.'s SOF ¶¶ 26-27).

Without disputing this, Defendants again fall back on their argument that any improper motive, personal animus, or bad faith intent to injure cannot be linked to Field. But again, Field himself told Minichiello, just after discussing the Second Street Property -- with both the Mayor and Field present -- that, "Marchese's got to go.  That's the problem."  Id.  For Field to have made that statement, immediately after a meeting at which the Mayor was involved, belies any notion that a reasonable jury could not conclude that Field's actions were directed by a motivation on the part of the Mayor to harm or injure Marchese.

Field's and the Mayor's comments are exactly the type of "language of personal malice and bad faith retaliation aimed at punishing" a plaintiff that satisfies the standard. Tapalian, 377 F.3d at 7.  In this case, the statements: (1) that if Marchese were to "get on

19

board" then "everything goes away"; (2) "The problem is that fucking Joe Marchese!" and "You tell Joe Marchese to go fuck himself!"; and (3) "Marchese's got to go. That's the problem" are at least as egregious as the "request for two women" in Tapalian; or the "bad people" and "bitch" comments found to be sufficient to survive summary judgment in Rubinovitz v. Rogato, 60 F.3d 906, 912 (1ˢᵗ Cir. 1995). Summary judgment should therefore be denied.

## IV. PLAINTIFF HAS PRESENTED A TRIABLE CLAIM FOR VIOLATION OF ITS RIGHT OF SUBSTANTIVE DUE PROCESS.

Although Plaintiff did not include in its original Complaint a separate claim for a substantive due process violation under Section 1983, Plaintiff has contemporaneously moved to amend its Complaint to add such a claim against the Mayor and Field individually.

To be sure, the standard for articulating a substantive due process claim in the land use context is demanding, and only rarely will a case rise to the level of "horrendous" conduct that "shocks the conscience." However, this case bears an almost identical resemblance to a case in which that standard was met, Collier v. Town of Harvard, CIV. A. 95-11652-DPW, 1997 WL 33781338 (D. Mass. Mar. 28, 1997). As this Court well knows, Collier involved the efforts of a member of the Harvard Planning Board (DeBoalt) to "extort an easement" from the plaintiff (Collier) for his personal benefit. Id. at *5. DeBoalt did so via members of the Harvard Zoning Board of Appeals (ZBA), before whom Collier was seeking relief. Specifically, Collier testified that he was told by a member of the ZBA that "things would go a lot more smoothly…if I gave DeBoalt the easement that he wanted." Id. at *6. The Court denied the defendants'

motion for summary judgment, ruling that this conduct constituted a triable claim for a violation of substantive due process. Id. at *7.

The similarities between Collier and this case are striking. Indeed, Marchese's affidavit and deposition testimony that the Mayor told him he "should get on board" and "start to attend my fundraising events" and "everything goes away," is, like Collier's affidavit testimony, crystal clear, and both testimonies allege efforts by a government official to extort a personal benefit through the process of land use regulation. (Pl.'s SOF ¶¶ 23-25, 35). Therefore, "[t]he specificity with which the encounter is described by [Marchese] saves it from the fate suffered by" the more usual, nebulous claims of misconduct described in a substantive due process claim. Collier, 1997 WL 33781338 at *6. As in Collier, the Plaintiff's "allegations here are far more fundamental than a [mere] dispute over interpretation; they touch on corruption of the process." Id. at *7. Compare Mongeau v. City of Marlborough, 492 F.2d 14, 19-20 (1st Cir. 2007) (no triable substantive due process claim alleged because, unlike here, there were no allegations of threats, bribery, or extortion).

Moreover, as in Collier there is a direct link between the person demanding the benefit -- the Mayor -- and the person with the power to reward, or punish, the plaintiff: Here, Field's statement that "Marchese's got to go. That's the problem," made to Minichiello during a meeting with the Mayor.

Defendants likely will take the same strategy on this claim as they have on the others, by seeking to insulate the Mayor from the actions of Field. However (and notwithstanding Plaintiff's arguments on this point set forth above), the Mayor's statements alone give rise to a substantive due process violation. Indeed, the Mayor's

extortionate conduct by definition "was fueled by improper motivations." Id. at *6.

What other purpose could it have had?

Therefore, even if one were to strain credulity to breaking and accept that there was no link between the actions of Field and the statements made by the Mayor, then the statements alone, along with Marchese's reasonable belief that the Mayor did, in fact, have the power to "make everything go away," are sufficient. In the analogous context of a federal criminal extortion case, apparent authority by a public official is all that must be proven.

> In the case of a public official, rather, the threat is implicit in the power he wields by virtue of his office: "The rationale is, that subsumed in the official title lies a dormant power, the office itself becomes the threat, the ominous spectre capable of retaliating when provoked." Thus, the courts have found extortion when an individual pays because he reasonably believes that if he did not an official might use his power to that individual's detriment.

U.S. v. Rivera-Medina, 845 F.2d 12, 14 (1st Cir. 1988) (quoting U.S. v. Kelly, 722 F.2d 873, 877 (1st Cir. 1983).

If the implicit power of the office and title alone is sufficient in a criminal bribery case, it certainly must suffice here, where Marchese reasonably believed that the Mayor would use his office to make "everything go away" only if Marchese "got on board" and started attending the Mayor's fundraising events -- in other words, if Marchese learned "the name of the game." (Pl.'s SOF 23-25, 35). Thus, the Mayor's statements, even without direct testimony confirming a link with Field's conduct, are actionable as a substantive due process violation.

22

## V.  DEFENDANTS' MOTION FOR SUMMARY
## JUDGMENT ON PLAINTIFF'S MASSACHUSETTS CIVIL
## RIGHTS ACT AND CONSPIRACY CLAIMS MUST BE DENIED.

Defendants' Motion for Summary Judgment as to Count III (MCRA) and Count
IV (Conspiracy) must also be denied.

Plaintiff has moved to amend the Complaint to add the Mayor and Field as
defendants individually, thereby mooting Defendants' first argument as to the MCRA
claim. Furthermore, as set forth above, there are genuine issues of material fact as to
whether or not Defendants have interfered with Plaintiff's constitutional rights, conduct
for which the MCRA offers redress. Meuser v. Federal Express Corporation, 564 F.3d
507, 516. (1st Cir. 2009). Likewise, there are genuine issues of material fact as to
whether or not the Mayor and Field did so via "threat, intimidation, or coercion." The
statements made by the Mayor to Marchese as described herein clearly satisfy that
standard. Id. and cases cited.

As to Plaintiff's Conspiracy claim, again, as described herein, there are genuine
issues of material fact as to whether or not the Mayor and Field "acted in concert" to
violate Plaintiff's rights in violation of Section 1983, or whether, as Defendants claim,
Field acted alone. Williams v. City of Boston, 771 F. Supp. 2d 190, 204 (D. Mass. 2011).

For the same reasons, Plaintiff also has demonstrated a triable claim for
conspiracy under Massachusetts law. Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998).


## VI.  COUNT V IS A REQUEST FOR RELIEF.

Although stylized as a separate claim, Count V (For Declaratory and Injunctive
Relief) of Plaintiff's Complaint is a request for relief under the substantive claims

discussed above. Plaintiff is not seeking from this Court a declaration as to the lawful

interpretation of the Everett Zoning Ordinance. As discussed at p. 14, *supra*, the

objectively correct interpretation of the Ordinance is irrelevant to this action, because the

"interpretations" adopted by the Defendants were merely a pretext for their unlawful

conduct.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment

should be denied.


Plaintiff
Wentworth Precious Metals, LLC


/s/ Justin Perrotta

_____
Justin Perrotta (BBO # 641828)
Law Offices of William V. Hovey
27 School Street, Fifth Floor
Boston, MA 02108
617-443-0123
617-443-0122 (fax)
jmp@hoveylaw.net


Dated: Aug. 14, 2012


### Certificate of Service

I, Justin Perrotta, certify that the above document will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF), and paper
copies will be served upon any party or counsel of record who is not a registered
participant of the Court's ECF system upon notification by the Court of those individuals
who will not be served electronically. /s/ Justin Perrotta

Dated: Aug. 14, 2012