UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WENTWORTH PRECIOUS METALS, LLC,    )
                                   )
          Plaintiff,               )    CIVIL ACTION NO.
                                   )    11-10909-DPW
v.                                 )
                                   )
CITY OF EVERETT,                   )
CARLO DeMARIA, JR., as he is the   )
Mayor of the City of Everett,      )
FRANK NUZZO, as he is the Code     )
Enforcement Officer of the City of )
Everett, and                       )
JOHN FIELD, as he is the Building  )
Inspector of the City of Everett,  )
                                   )
          Defendants.              )
                                   )

MEMORANDUM AND ORDER
February 4, 2013

     This is an action alleging political retaliation.  Plaintiff
Wentworth Precious Metals, LLC claims that the Defendant City of
Everett, Massachusetts, and several city officials also named as
Defendants, singled out Plaintiff for unfavorable treatment
because its principal and manager, Joseph Marchese, refused to
endorse or donate adequately to the election campaign for Carlo
DeMaria during and after Mayor DeMaria's successful bid for Mayor
of the City of Everett.

     The Complaint alleges violations of both state and federal
laws.  Specifically, Count I alleges political retaliation in
violation of 42 U.S.C. § 1983, Count II alleges selective
enforcement also in violation of 42 U.S.C. § 1983, Count III
alleges interference with rights by means of threats,
intimidation or coercion in violation of the Massachusetts Civil

Rights Act, Count IV alleges civil conspiracy, and Count V seeks declaratory and injunctive relief.

Defendants move for summary judgment arguing that any actions that the City took against Wentworth constituted legitimate efforts to enforce Everett Zoning Ordinances; that John Field, the City's Building Inspector who took these enforcement actions, was unaware of who did or did not donate to Mayor DeMaria's campaign; and furthermore, that Field did not act at the Mayor's behest in taking enforcement actions against Wentworth.

I will deny the City's motion with respect to the federal retaliation and selective enforcement claims (Counts I and II), but grant the motion with respect to the conspiracy and Massachusetts Civil Rights Act claims (Counts III and IV). Finally, I will dismiss Count V, which improperly styles forms of relief - specifically, declaratory and injunctive relief - as substantive claims.  If necessary, I will address issues of relief should any of the substantive claims prove successful.

## I.   BACKGROUND

### A.   *Facts*[1]

Wentworth Precious Metals, LLC is a scrap metal recycling company which holds permits from the City of Everett for the operation of

---

[1] I recount the facts herein as set forth in the Parties' "statement[s] of material facts . . . as to which the moving party contends there is no genuine issue to be tried" pursuant to Local Rule 56.1.

a scrap metal, junk, and recycling facility at 431 Second Street - 0 Terminal Street, and at 413-421 Second Street, both in Everett, Massachusetts.  These properties are within the City's Industrial Limited District ("ILD"), which is subject to particular requirements and Zoning Ordinances, including Section 21 setting out the permissible uses of properties in the ILD, and Section 27 setting out various definitions including "Materials Recovery Facility" and "Junk Yard/Facility."  The City of Everett approved Wentworth's licenses each year from 2008-2010.

Joseph Marchese, Jr. is the principal and sole manager of Wentworth.  Marchese leases the Property to Minichiello Brothers, Inc., which does business under the name Scrap-It.  Scrap-It operates the actual scrap metal and recycling facility located on Wentworth's property.  It accepts scrap metal in bulk, processes it into large bales, and sells it to wholesale commodity traders.

There are six other businesses nearby that provide similar services:  (1) HH&M Metals, Inc., (2) M&S Metals, Inc., (3) American Scrap Metal ("ASM"), (4) Paul Mattucchio, Inc., (5) Woodwaste, and (6) Polarized NE Co., Inc, doing business as Second Street Iron and Steel ("Iron & Steel").  Plaintiff alleges that these six businesses have not received unfavorable treatment of the type visited on Wentworth.

<u>1. Mayor DeMaria's Campaign and Election</u>

In 2007, both Joseph McGonagle and Carlo DeMaria ran for Mayor of the City of Everett.  Marchese decided to support McGonagle.  Ultimately, however, DeMaria was elected.

After DeMaria became Mayor, Marchese attended one fundraising event for the Mayor's campaign fund on May 12, 2008 and donated $250 to the Committee to Elect Carlo DeMaria. Marchese's purposes for attending and donating are the subject of some dispute.  Marchese claims that he attended and donated as a personal favor to a friend who was running the fundraising event, and that the Mayor was aware of these facts.  Defendants object to this characterization stating that it is "inadmissible opinion and argument."  It is undisputed, however, that Marchese has not since donated to the Mayor's campaign or attended any of his fundraising events.  On at least one occasion a private fundraiser for the Mayor's campaign, Gus Serra, told Marchese that his refusal to donate to the Mayor's campaign created animosity between the two.  By contrast, all of the other metal recycling businesses within the ILD regularly contribute significant sums to the Mayor's campaign fund.

In March 2010, the Mayor appointed John Field as the City's Inspector of Buildings and Zone Enforcement Officer, a post Field held until June 2012.  Field was Mayor DeMaria's first appointment to Building Inspector.  As Building Inspector, Field held responsibility for enforcing and interpreting the City's

4

Zoning Ordinances and State Building Codes.  Plaintiff alleges
that Mayor DeMaria testified that he has ultimate control over
Field's enforcement operations and that he can, and does, direct
Field's enforcement from time to time.[2]  Defendants argue,
however, that the Mayor testified that he does not "interfere
with the work of employees in the city."  Defendants further
argue, but Plaintiffs dispute, that the Mayor never discussed
campaign contributions with Field and that Field was unaware of
any involvement Marchese did or did not have in the Mayor's
campaign.

### 2. Enforcement Actions Against Wentworth Begin

In April 2010, Field received a complaint regarding the
condition of Wentworth's properties.  In May 2010, Field met with
Marchese and Frank Minichiello, the owner and operator
responsible for the day-to-day operations of Scrap-It, to discuss
the complaint.  Two months later, on July 30, 2010, Field sent a
letter to Marchese informing him that Wentworth's operations
violated the storage requirements of the Zoning Ordinances and
that "[i]f you fail to comply, I will seek to have the above-
mentioned license revoked."  Field followed up with a letter on
August 30, 2010 attaching a Notice of Violation and imposing a

---

[2]In support of this proposition Plaintiff's Local Rule 56.1
Response mistakenly cites to Ex. 4 to Defendants' 56.1.  Mayor
DeMaria's transcript is actually Ex. 1 to Defendants' 56.1
statement.  However, the relevant page appears to be missing from
the deposition transcript that Defendants uploaded to CM/ECF.

fine.  The letter recounts the prior discussions between the
parties and further states,

> your operation is in non-compliance.  You must
> discontinue the use, as presently used . . . ,
> modify the operation to use the existing
> structure-as was originally permitted, [and]
> submit to this office an agreement to enclose the
> operation in a building or face the possibility of
> continued enforcement actions.

Plaintiff has not paid any fines.

On October 19, 2010, Field sent a third letter to Plaintiff,
but this letter was not addressed solely to Plaintiff.  Field
sent a similar letter to the other junk recycling businesses
declaring that their businesses constituted "heavy
manufacturing," requiring a special permit from the City pursuant
to Section 21 of the Zoning Ordinances.  The letter also
indicated that enforcement would be stayed for one year in order
to give the recipients time to come into compliance with the
Ordinance.  The stay came at the insistence of the Mayor's
office, over Field's objection.

### 3. City Official's Statements and Further Enforcement

In December 2010, Marchese went to City Hall to file a
license renewal regarding another of his businesses, Supreme
Cars, an auto sales business, for which the City had renewed the
license every year from 1978-2010.  Field opposed renewal of the
license for Marchese's Supreme Cars business.  Plaintiff
contends, but Defendants dispute, that after the hearing for

renewal, the Mayor approached Marchese and said "it looks like you're having a hard time tonight . . . your problem is you should get on board," and that he told Marchese to "start to attend my fundraising events," and that if he did, "everything goes away."

Also around November or December of 2010, Minichiello attended a meeting with the Mayor and Field at City Hall. Plaintiffs contend, but Defendants dispute, that at that meeting, the Mayor screamed "the problem is that fucking Joe Marchese! You tell Joe Marchese to go fuck himself," and that after the meeting, when Minichiello inquired of Field, Field stated "Marchese's got to go. That's the problem."

In March 2011, Field opposed Wentworth's application for renewal of its licenses, arguing, among other things, that its operation constituted unlicensed "heavy manufacturing" in violation of the Zoning Ordinances.  Ultimately, the Board of Aldermen renewed Wentworth's licenses.  During 2011, HH&M Metals, M&S Metals, ASM, and Mattuchio all renewed their licenses to operate their scrap metal recycling businesses.  Field did not oppose any of these other applications.

### 4. Events Since Plaintiff Filed this Action

Plaintiff filed this action on April 19, 2011 in Massachusetts Superior Court for Middlesex County, and served Defendants on April 22, 2011.

Plaintiff alleges, but Defendants dispute, that in the next month, May 2011, the Mayor approached Marchese, who was at City Hall to pay for and pick up his business licenses, and stated that he (the Mayor) had the power to "make everything go away" and threatened that he could easily take Marchese's real estate by eminent domain.

On May 20, 2011, Defendants removed this action to the District of Massachusetts.

Thereafter, on July 26, 2011, Field sent a letter to Marchese ordering him to Cease and Desist Wentworth's outside storage at the Second Street location.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to

create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

### III. DISCUSSION

Plaintiff presses four distinct claims: (1) retaliation, (2) selective enforcement, (3) civil rights violations under Massachusetts state law, and (4) conspiracy.  I address each claim in turn.[3]

### A. Retaliation

The government cannot deprive an individual of a "valuable government benefit" in retaliation for the exercise of constitutional rights.  *Lynch* v. *Boston*, 180 F.3d 1, 13 (1st Cir. 1999). As the Supreme Court observed over forty years ago, "[f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely . . . especially, his interest in freedom of speech."  *Perry* v. *Sindermann*, 408 U.S. 593, 597 (1972).  To

---

[3] Plaintiff also purports to raise a substantive due process claim in its opposition brief, and Defendants address it in their reply.  The Complaint does not bring a claim for substantive due process.  Plaintiff sought leave to amend the Complaint to add this claim, but I denied the motion without prejudice on September 13 pending outcome of the summary judgment practice. As will appear from the discussion below, *see infra* Section III(E), it appears Plaintiff's substantive due process claim would be futile.

establish a claim for retaliation under 42 U.S.C. § 1983, a
plaintiff must show (1) that it engaged in constitutionally
protected conduct, (2) that it suffered an adverse action, and
(3) that the constitutionally protected conduct was a substantial
or motivating factor for the adverse action. *Barton* v. *Clancy*,
632 F.3d 9, 23 (1st Cir. 2011); *Chamberlin* v. *Town of Stoughton*,
601 F.3d 25, 30 (1st Cir. 2010).

The First Circuit has held that although the United States
Constitution does not expressly refer to retaliation,
"retaliation . . . is nonetheless actionable because retaliatory
actions may tend to chill individuals' exercise of constitutional
rights." *Barton*, 632 F.3d at 23.  The touchstone of any
retaliation claim is whether "the defendants' actions would deter
a reasonably hardy individual from exercising his constitutional
rights." *Id.* at 29 (internal quotation marks and alterations
omitted).

1. Constitutionally Protected Conduct

As a matter of established Supreme Court law, campaign
contributions are a form of protected speech. *See Buckley* v.
*Valeo*, 424 U.S. 1 (1976).  Equally clear is an individual's right
to be free from compelled speech. *See Riley* v. *Nat'l Fed'n of
the Blind,* 487 U.S. 781 (1988).  Defendants argue that Plaintiff
cannot show that it engaged in any constitutionally protected
activity because Marchese, Plaintiff's principal, did, in fact,

donate to the Mayor's campaign at one point.  This argument is perplexing on a number of levels.

*First and most fundamentally*, the nature and extent of donations is clearly at the heart of constitutionally protected speech.  *See Buckly* v. *Valeo*, 424 U.S. 1 (1976).  Defendants' argument that "it defies common sense for the plaintiff to allege that the City retaliated for not making campaign donations, when in fact all the principals . . . <u>did</u> make such donations" speaks only to the causative connection between the protected speech and adverse action.

*Second*, Plaintiff's claim is not premised on the campaign donation that Marchese did make.  It is premised on the donations and endorsements that he refused to make.  Plaintiff is indisputably the master of its own Complaint.  Defendants may challenge the nature or sufficiency of Plaintiff's claims and evidence, but may not recast Plaintiff's claims as predicated on entirely different conduct.

*Finally*, even taking account of Marchese's single donation on May 12, 2008, it certainly does not "def[y] common sense" to allege that the Mayor may have retaliated against Plaintiff for earlier or later refusing to donate to his campaign.

I find that Plaintiff engaged in constitutionally protected action when, through Marchese, it refused to donate to the Mayor's campaign fund or endorse him as a candidate.

11

## 2. Adverse Action

Defendants next argue that Plaintiff cannot show any adverse action because it has not paid any fines, lost any license, or ceased or modified its actions in any way.  Plaintiff has successfully renewed its licenses despite the opposition from Field but has refused to comply with the fines and orders, continuing to operate as before with large piles of metal on the property and without the "heavy manufacturing" license. Defendants thus assert that Plaintiff cannot complain of any adverse action because the City's actions have not successfully "deterred [Plaintiff] from exercising [its] constitutionally protected rights."  *Barton*, 632 F.3d at 29.

This argument misunderstands the nature of the "adverse action" inquiry.  There is no "lack of success" defense for a defendant who engages in a scheme of retaliatory harassment.  Nor is a defendant saved from liability under Section 1983 simply because a plaintiff decides to bring an action to block defendants' unlawful retaliation before it has an opportunity to solidify fully and chill constitutionally protected speech effectively.

The First Circuit has addressed this issue on more than one occasion in the employment retaliation context.  In *Barton* v. *Clancy*, the First Circuit rejected a city's argument that there was no adverse employment action in the absence of "specific changes in his working condition such as the loss of a

promotion." 632 F.3d at 29. To the contrary, the First Circuit
held that, "[a] campaign of informal harassment . . . support[s]
a First Amendment retaliation claim if the alleged harassment
would have . . . a chilling effect." *Id.* Similarly, in *Grajales*
v. *Puerto Rico Ports Auth.*, the First Circuit held that
"[p]olitical discrimination claims may be based on harassment as
long as the 'acts are sufficiently severe to cause reasonably
hardy individuals to compromise their political beliefs and
associations in favor of the prevailing party.'" 682 F.3d 40, 47
(1st Cir. 2012) (quoting *Welch* v. *Ciampa*, 542 F.3d 927, 937 (1st
Cir. 2008). Other circuits have come to the same conclusion as
well. *See Coszalter* v. *City of Salem*, 320 F.3d 968, 976-77 (9th
Cir. 2003) (holding that actions such as "an unwarranted
disciplinary investigation" and "a threat of disciplinary action"
may establish Section 1983 liability under the "reasonably likely
to deter" test); *Bart* v. *Telford*, 677 F.2d 622, 625 ("[A]n entire
campaign of harassment which though trivial in detail may have
been substantial in gross [raises] a question of fact whether the
campaign reach the threshold of actionability under section
1983.").

Plaintiff has produced evidence that the City has taken an
official position opposing Wentworth's operating licenses, with
Field appearing in person to oppose license renewals, and has
ordered Plaintiff to pay a variety of fines. This kind of
pattern of official opposition and fines certainly has the

potential to chill speech by persons of ordinary hardiness.  That Plaintiff believed the City's actions were illegitimate and refused to acquiesce to the City's pressures pending the outcome of this Court's ruling does not make the City's actions any less adverse or any less capable of chilling speech.

Even if motivated by legitimate municipal concerns, the City's actions are still adverse - they are designed to force compliance with the City's position.  If motivated by retaliatory animus for Plaintiff's refusal to donate fulsomely to a political campaign, such adverse actions are the kind of scheme of harassment that can give rise to Section 1983 liability.  *See Welch* v. *Paicos*, 66 F. Supp. 2d 138, 171 ("[E]ven a government decision partly based on permissible factors must fall if materially informed by unconstitutional retaliatory animus." (citing *Connell* v. *Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998))).

### 3. Substantial or Motivating Factor

"Free speech is a fundamental right but, to survive summary judgment, [a plaintiff] must offer some proof that defendants' allegedly retaliatory actions were motivated by the protected speech." *Rubinovitz* v. *Rogato*, 60 F.3d 906, 911 (1st Cir. 1995). It is not enough to show that a plaintiff suffered adverse action after engaging in protected speech.  *See id; see also Lewis* v. *City of Boston,* 321 F.3d 207, 219 (1st Cir. 2003) ("Although close temporal proximity between two events may give rise to an inference of causal connection, that inference is not necessarily

conclusive . . . ." (internal quotations and citations omitted)).

A plaintiff must adduce some evidence capable of linking the

motivation to the adverse actions. *See Manego* v. *Cape Cod Five*

*Cents Savs. Bank*, 692 F.2d 174, 177 (1st Cir. 1982) ("A lay

person, aggregating all of the circumstances . . . might suggest

the old adage that where there is smoke, there is fire. . . . The

district court recognized, properly, that smoke alone is not

enough to force the defendants to a trial . . . ."). The

required showing need not find support in direct evidence.

Rather, a plaintiff may rely on circumstantial evidence. *See*

*Lewis,* 321 F.3d at 219 ("[A]s in other contexts where motivation

is an issue, [plaintiff] can rely upon circumstantial evidence.")

In either fashion, the plaintiff must produce evidence, whether

direct or circumstantial, "from which a jury reasonably may infer

that [plaintiff's] constitutionally protected conduct was a

substantial or motivating factor" and this evidence must be

sufficient to justify shifting the burden of persuasion to the

defendant. *Diaz-Bigio* v. *Santini*, 652 F.3d 45, 51-52, 51 n.3

(1st Cir. 2011) (quoting *Acevedo-Diaz* v. *Aponte*, 1 F.3d 62, 67

(1st Cir. 1993)).

The evidence underlying motivation in this case presents a

classic credibility dispute. Defendants allege that the Mayor

was unaware when Field's began enforcement actions against

Wentworth and has testified that he does not interfere with his

employees' work, including that of Field. Defendants further

15

allege that Field was likewise entirely unaware of whoever may or may not have donated to the Mayor's campaign.  Plaintiff denies these allegations and has produced evidence, in the form of affidavits and testimony from Marchese and Minichiello, that the Mayor approached Marchese and told him that if he "start[ed] to attend my fundraising events" that "everything goes away" and that Field explained after a meeting about the zoning requirements that "Marchese's got to go.  That's the problem."  Plaintiff has also indicated that the City opposed Wentworth's license renewals on the grounds that it was operating without a "heavy manufacturing license" during the stay of enforcement, but did not oppose the other metal recycling companies' renewals on that basis.

This is a quintessential factual dispute.  If a jury credits Defendants' witnesses, then it may reasonably find no causative link between the protected speech and the adverse actions.  However, a jury deciding to credit Plaintiff's evidence and witnesses, could reasonably infer that the Mayor acted with retaliatory animus and that the enforcement actions and license oppositions were a tool to force Marchese, as the principal and manager of Wentworth, to "get on board."[4]  A jury could also

---

[4] Defendants understandably cite no authority for their argument that because the bulk of the adverse actions took place before the alleged statements by the Mayor and Field, there is no causal relationship.  Although it is true that adverse actions taking place before the protected *speech itself* cannot be motivated by retaliatory animus, *see Rubinovitz*, 60 F.3d at 911, there is no

reasonably infer from the Mayor's presence at the meeting between Minichiello and Field that the Mayor was more involved in Zoning Enforcement decisions than Defendants admit.  Similarly, a reasonable jury might infer from Field's statements following the meeting, that his actions were influenced by the Mayor, and even that Field may have been aware that the Mayor was using his actions as a retaliatory tool.  The resolution of disputes over this evidence turns on questions of witness credibility, which is inappropriate for resolution on a motion for summary judgment. *Rodriguez* v. *Municipality of San Juan*, 659 F.3d 168, 175 ("[T]he ground rules for summary judgment leave 'no room for credibility determinations, no room for the measured weighing of conflicting evidence . . . .'").

Defendants rely on *Nestor Colon Medina & Sucesores, Inc.* v. *Custodio* to argue that despite Plaintiff's prima facie showing, summary judgment would be inappropriate because the record reveals non-discriminatory reasons for the City's adverse actions specifically that the City received complaints regarding the Plaintiff's property and Plaintiff is not in compliance with the Zoning Ordinances.[5]  This argument is unpersuasive.  First,

---

such logical impediment to such animus underlying adverse actions taking place before statements *evidencing* that motivation.

[5] Defendants also contend that Plaintiff is estopped from asserting that it is in compliance with Zoning Ordinance Section 21 because it failed to appeal Field's August 30, 2010 letter, and therefore failed to exhaust its administrative remedies. However, this is beside the point.  The question is not whether

Defendants' cited language, "[e]ven supposing that [plaintiff] were to have established a prima facie case, the defendants have asserted a powerful 'nondiscriminatory' reason in rebuttal," *Nestor Colon*, 964 F.2d 32, 42 (1st Cir. 1992), was not itself dispositive in that case.  More fundamentally, the First Circuit went on to say, in the very next sentence, that "[n]othing presented by [plaintiff], other than sheer conclusory allegations, addresses this [non-discriminatory reason]" and that "[t]here is little to suggest . . . that this 'nondiscriminatory' reason is pretextual."  *Id.* at 43.  Here, Plaintiff has produced more than conclusory allegations of retaliatory animus.  It has produced testimony that the Mayor specifically told Marchese that "everything goes away" if he "get[s] on board."  If credited, this could powerfully undercut the City's non-discriminatory motivations argument in the minds of the jurors.  Furthermore, in *Nestor Colon*, the plaintiff "neither alleged nor offered any facts to show that similar permits had been granted to similarly qualified applicants."  *Id.* at 42.  As will appear more fully in Section III(B), below, in this case the parties sharply dispute the question of whether the other metal recycling businesses were "similarly qualified" with respect to the outside storage issue.

---

Plaintiff has complied with the Zoning Ordinances, but rather whether this purportedly non-discriminatory justification is mere pretext for retaliatory animus.  I do not reach the issues of estoppel and exhaustion, but I note that Plaintiff has appealed Field's later, July 26, 2011 letter.

18

But even apart from this *contested* issue, Defendants have not yet offered any evidence or even any argument to justify treating Plaintiff differently from the other companies with respect to the "heavy manufacturing" requirement.  The only evidence currently in the record to distinguish Plaintiff from the other companies with respect to "heavy manufacturing" is Plaintiff's protected speech.  Plaintiffs have raised more than the "arguable question of pretext" that the *Nestor Colon* court found sufficient to survive the motion for summary judgment.  *Id.* at 41.

## B. Selective Enforcement

A selective enforcement claim under Section 1983 is a species of equal protection violation.  *See generally Tapalian* v. *Tusino*, 377 F.3d 1 (1st Cir. 2004); *Rubinovitz* v. *Rogato*, 60 F.3d 906 (1st Cir. 1995).  To establish a claim for selective enforcement under 42 U.S.C. § 1983, a plaintiff must show (1) that it was selectively treated compared with others similarly situated, and *either* (2) that the selective treatment was based on "impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights" *or* (3) "malicious or bad faith intent to injure."  *Yeradi's Moody St. Restaurant & Lounge* v. *Bd. of Selectmen*, 878 F.2d 16, 21 (1st Cir. 1989).  Specifically, the Plaintiff "must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . .

out for unlawful oppression." *Rubinovitz*, 60 F.3d at 909-10
(internal quotation marks omitted) (alterations in original)
(quoting *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19
(1st Cir. 1989)).  Plaintiff's Complaint alleges all three
elements and Defendants' motion for summary judgment attacks each
element of Plaintiff's claim.

    <u>1. Similarly Situated</u>

    At summary judgment, the Plaintiff bears the burdens of
production and persuasion on the first element of the analysis:
similarly situated persons.  *Cordi-Allen* v. *Conlon*, 494 F.3d 245,
250-51 (1st Cir. 2007) ("[T]he case law makes clear that the
burdens of production and persuasion must be shouldered by the
party asserting the equal protection violation.").  In order to
prevail, Plaintiff must "identify and relate *specific instances*
where persons *situated similarly in all relevant aspects* were
treated differently." *Id.* (emphasis in original) (quoting
*Buchanan* v. *Maine*, 469 F.3d 158, 178 (1st Cir. 2006)).  This
standard does not require "exact correlation." *Tapalain,* 377
F.3d at 6.  However, it is not a mere formality.  Indeed, the
First Circuit considers the "similarly situated" requirement to
be "a very significant burden." *Cordi-Allen*, 494 F.3d at 251.
It is not enough that the same regulatory scheme governs the
allegedly similarly situated persons, a plaintiff must adduce
sufficient evidence "to establish factual as well as regulatory
similarity." *Id.* at 252.  Fundamentally, the test is:

> whether a prudent person, looking objectively at the
> incidents, would think them roughly equivalent and the
> protagonists similarly situated. Much as in the
> lawyer's art of distinguishing cases, the "relevant
> aspects" are those factual elements which determine
> whether reasoned analogy supports, or demands, a like
> result. Exact correlation is neither likely nor
> necessary, but the cases must be fair congeners.

*Tapalain*, 377 F.3d at 6.  The requisite degree of similarity is "relaxed somewhat" in cases involving "personal malice and bad faith retaliation." *Cordi-Allen*, 494 F.3d at 251 n.4 (citing *Tapalain*, 377 F.3d at 7).

Plaintiff identifies four other businesses that it argues are "situated similarly in all relevant aspects": HH&M Metals, M&S Metals, ASM, and Mattucchio.  Plaintiff then identifies two specific categories of instances in which the City allegedly treated these similarly situated companies differently: (a) enforcement of the outside storage requirement of Zoning Ordinance Section 21(a), and (b) opposition to Plaintiff's license renewal on grounds that it engages in "heavy manufacturing."

*a. Outside Storage*

Section 21 of the City's Zoning Ordinances sets out the permissible uses of properties and buildings within the ILD, including:

> 5. Storage of goods in containers where all
> storage is contained within the building, not
> including storage of any raw or natural materials.

21

> 6. Light manufacturing entirely contained within the structure with no associated emissions of noxious odors of noise.
>
> 7. Heavy manufacturing by Special Permit providing there is no outside storage work and there is [sic] no emissions of noxious odors, smoke or noise, and no vibration discernible on the exterior of the building.

Plaintiff contends that it is not unique in its practice of storing scrap metal outside its buildings.  It alleges that HH&M Metals, M&S Metals, ASM, and Mattucchio - each of which also falls within the ILD - also store piles of scrap metal outside, but that the City did not take the same actions against those companies with respect to outside storage.  Plaintiff has provided evidence that these companies are subject to the same regulatory requirements and engaged in factually similar conduct. While the issue can generate evidentiary dispute, the evidence ultimately satisfies me that Plaintiff can meet its burdens of production and persuasion sufficiently to present factual a question for a jury.  Consequently, the issue is not amenable to judgment as a matter of law.

The parties dispute a variety of factual issues regarding the characterization and operation of these other scrap metal recycling businesses.

*First*, the parties have adduced contradictory evidence regarding the existence and extent of outside storage by these other companies.  The factual record on this point remains somewhat vague at this stage.  While Plaintiff does not allege

that the other companies store piles up to 30 feet high on their properties - as Defendants allege occurs on Plaintiff's property - it does allege that the size of its scrap metal piles, as well as those of the other companies can change from day to day and hour to hour.  Defendants rely on *Campbell* v. *Rainbow City*, 434 F.3d 1306, 1316 n.8 (11th Cir. 2006) for the proposition that degree of non-conformity is a valid basis for disparity in the City's enforcement actions.  However, *Campbell* addressed the question post-trial, after a jury had made final determinations of fact.  Such clarity in a fully developed factual record is not present at this stage in the present case.  While it is true that a plaintiff engaging in the same business as other companies, but operating on a "scale . . . [that] was dramatically different," is not similarly situated to the other businesses, *Cordi-Allen*, 494 F.3d at 252, the record in this case is not sufficiently established for me to rule, as a matter of law, that Plaintiff's business differs in scale from the others as discussed in *Cordi-Allen*.

*Second,* Defendants allege that HH&M Metals and M&S Metals, are not subject to Section 21's "outside storage" provision because their operations were grand-fathered in as beginning before the enactment of Section 21.  This distinction does not weigh in either party's favor.  Under Massachusetts law, non-confirming uses of property can be grand-fathered in if the non-conforming *use* existed prior to the zoning change.  *Powers* v.

*Building Inspector*, 296 N.E.2d 491, 494 (Mass. 1973).  Neither party has adduced any competent evidence regarding when HH&M Metals or M&S Metals began their currently, allegedly non-conforming use.  Defendants have shown that both were *licensed* prior to the enactment of Section 21, but Defendants acknowledge that Field did not investigate when the operations themselves began.

*Third*, Defendants assert, and Plaintiff admits, that the City has received at least one complaint regarding Plaintiff's property, but has not received any such complaints regarding the other four companies' properties. (Def.'s ¶¶ 56.1 85, 90, 95, 104.)  This is a meaningful differentiating factor, and alone might be sufficient to justify the City's differing treatment, but because I find evidence of personal malice and bad faith retaliation, *see infra* Section III(B)(3), I decline to grant summary judgment on this basis.  With the somewhat relaxed requirements in the shadow of such malice, *see Cordi-Allen*, 494 F.3d at 251 n.4, it would not be appropriate to dispose of this claim on this record.

Defendants suggest that this case is indistinguishable from *Smith* v. *City of Boston,* No. 03 Civ. 10062, 2004 WL 1572626 (D. Mass. July 13, 2004) where I held that the defendant's exclamation "we've got him" upon receiving the no-heat complaint that precipitated the city's enforcement was "too insubstantial to satisfy [plaintiff's] responsibility to prove . . .

24

impermissible consideration" despite some "evidence suggesting . . . pre-existing animosity" between the plaintiff and the defendant.  *Id.* at *4-5.  Defendants reliance on *Smith* is misplaced.  In *Smith*, the plaintiff provided "no examples of how similar code violations were handled" and "no facts showing that other . . . complaints were treated any differently."  *Id.*  In this case, Plaintiff has produced substantial evidence regarding how the other metal recycling businesses were similarly situated and how "similar code violations were handled."  Furthermore, the defendants' "we've got him" exclamation in *Smith* upon receiving the no-heat complaint was *itself* the evidence of animosity, whereas in this case, the evidence animosity comes from conversations between Field and Minichiello and between Marchese and Mayor DeMaria.  Far from falling within the four corners of *Smith*, this case presents much more extensive evidence of disparate treatment of similarly situated entities and more substantial evidence of personal animosity.

While certain evidence in the record remains vague and the issue presented is close, I find that Plaintiff has adduced "sufficient proof on the relevant aspects of the comparison to warrant a reasonable inference of substantial similarity."  *Id.* at 251.  To be sure, Defendants have adduced, and Plaintiff has admitted, "certain distinguishing or mitigating circumstances," but taking the significant evidence of personal malice and bad faith in the light most favorable to the non-moving party, as I

must, these circumstances do not appear so significant "as would render the comparison inutile." *Id.*   As in *Rubinovitz*, "there is enough indication of a malicious orchestrated campaign causing substantial harm – though only barely enough evidence – that the case cannot be resolved on summary judgment."   60 F.3d at 912.

   *b. Heavy Manufacturing*

   Defendants' allegedly unjustified differential treatment of Plaintiff with respect to the "heavy manufacturing" requirement is much clearer.   Field sent the October 19, 2010 letter to all five metal recycling businesses in the ILD (Wentworth and the four allegedly similarly situated businesses), as well as to one wood recycling business in the ILD, Woodwaste, and another metal recycling business nearby the others, but just outside the ILD in Everett's Industrial District, Iron & Steel.   This letter informed all seven that the City considered their businesses to constitute "heavy manufacturing," requiring a special permit that none of these businesses held.   The letter also informed all seven businesses that the City would stay enforcement of this requirement for one year in order to allow time to comply.

   Five months later, in March 2011, and in spite of the stay of enforcement supposedly still in effect, Field appeared in person to oppose Plaintiff's application for renewal of its licenses before the Board of Aldermen.   HH&M Metals, M&S Metals, ASM, and Mattuchio also renewed their licenses in 2011, but Field did not oppose any of these renewals.   Defendants have not

produced any evidence or argument to justify singling out
Plaintiff Wentworth, and, indeed, Field sent the October 19, 2011
letter to all seven businesses, indicating that he viewed all
seven businesses as similarly situated with respect to "heavy
manufacturing."  A reasonable jury could find that Defendants
treated Plaintiff differently from others similarly situated, and
therefore Defendants are not entitled to judgment as a matter of
law on this issue.

## 2. Impermissible Considerations

The exercise of constitutional rights is an impermissible
consideration for differential treatment in the context of a
selective enforcement claim under Section 1983.  *See Yeradi's
Moody St. Restaurant & Lounge* v. *Bd. of Selectmen,* 878 F.2d 16,
21 (1st Cir. 1989).  As discussed above, *see supra* Section
III(A)(3), the question of the motivation for the City treating
Plaintiff differently than the other businesses presents a
classic dispute of credibility inappropriate for resolution on a
motion for summary judgment.  Therefore, I find a genuine dispute
of material fact exists as to whether the City treated Plaintiff
differently based on an intent to punish Plaintiff for refusing
to donate to the Mayor's campaign.

## 3. Malicious or Bad Faith Intent to Injure

Even in the absence of a showing of invidious discrimination
or that defendants' selective enforcement is based on an intent
to punish for exercising a constitutional right, a plaintiff can

establish a viable equal protection claim with evidence of bad faith or a malicious intent to injure.  *Rubinovitz*, 60 F.3d at 911 (citing *Yeradi's*, 878 F.2d at 21).  Such cases are rare and "the malice/bad faith standard should be scrupulously met."  *Id.* (quoting *Yeardi's Moody St. Restaurant & Lounge, Inc.* v. *Board of Selectmen*, 932 F.2s 89, 94 (1st Cir. 1994)).  This is one of those rare cases in which the standard may ultimately be met.

As in *Tapalian*, "the . . . record is laden with the language of personal malice and 'bad faith' retaliation."  *Tapalian*, 377 F.3d at 7.  Both Marchese and Minichiello have testified that Mayor DeMaria has threatened Plaintiff with continued opposition before the Board of Aldermen, and has even threatened to take Plaintiff's land by eminent domain unless Plaintiff donates to the Mayor's campaign.  Minichiello also testified that the Mayor screamed "You tell Joe Marchese to go fuck himself" during a meeting regarding zoning and licensing issues for Plaintiff Wentworth and Scrap-It.  This kind of language is as bad or worse than that in *Tapalian* where the defendant conditioned job appointments and approval of construction projects on receipt of sexual favors.  *See id*.  Although the First Circuit in *Tapalian* addressed the question on the trial record after the jury returned a verdict for the plaintiff, the evidence offered in this case, if credited by a jury, could lead to a reasonable finding of similar facts.

In *Rubinovitz*, the court found sufficient evidence, though "barely enough evidence" of bad faith intent to injure where the defendant "sought to interfere with plaintiffs' hiring of a contractor using language about them ('bad people,' 'bitch') redolent of malice" and engaged in a scheme of harassment. *Rubinovitz*, 60 F.3d at 912.  Similarly, in this case, when Marchese did not pay the fines imposed in Field's letters, the Mayor and Field met with Minichiello, attempting to interfere with Plaintiff's licensing and operations using language equally or more redolent of malice ("the problem is that fucking Joe Marchese! You tell Joe Marchese to go fuck himself"). On the evidence presented, and taken in the light most favorable to the non-moving party, this is clearer evidence of bad faith and malicious intent to injure than in either *Tapalian* or *Rubinovitz*. There is at least a genuine dispute of material fact, and certainly sufficient evidence from which a jury could find personal malice.

### C. Massachusetts Civil Rights Act

The Complaint alleges that Defendants sought to force Plaintiff to donate to the Mayor's campaign by means of threat intimidation, or coercion in violation of the Massachusetts Civil Rights Act ("MCRA").  M.G.L. 12 §§ 11H, 11I; *see also Swanset Dev. Corp.* v. *Taunton*, 668 N.E.2d 333, 337 (Mass. 1996).  The MCRA provides, in relevant part, a cause of action "whenever any person or persons . . . interfere by threats, intimidation or

coercion . . . with the exercise or enjoyment . . . of rights
secured by the constitution of law of the United States . . . ."
M.G.L. 12 § 11H.  However, as a matter of well-settled
Massachusetts law, the City is not a "person" subject to suit, as
the MCRA contemplates that term.  *See Howcroft* v. *City of
Peabody*, 747 N.E.2d 729, 744 (Mass. App. Ct. 2001) ("[T]here is
no indication in the MCRA that the word 'person' includes either
the Commonwealth or any of its political subdivisions."); *see
also Smith*, 2004 WL 1572626, at *7.  Field, Nuzzo, and Mayor
DeMaria are Defendants in this action only in their official
capacities as city officials.  Claims against city officials in
their official capacities are subject to the same restrictions as
claims against the City itself, *see Kentucky* v. *Graham*, 473 U.S.
159, 166 (1985), and therefore must be dismissed for the same
reason.

I note that Plaintiff filed a motion to amend the Complaint
to add Field, Nuzzo, and Mayor DeMaria as defendants in their
individual capacities.  Although city officials are not subject
to the MCRA when named in their official capacities, they may be
liable when named in their individual capacities.  "Under the
MCRA, state officials in their individual capacities may be
subject to liability if it can be shown that they interfered with
the exercise or enjoyment of rights secured by the Constitution
or laws of the United States or Massachusetts by means of
threats, intimidation, or coercion."  *Whalen* v. *Com.*, 2005-00886,

2006 WL 1727990, *7 (Mass. Super. June 26, 2006) (internal quotation marks omitted).

The terms "threat" and "intimidation" might appear to require some actual or attempted physical force that is not present in this case. *See Kennie* v. *Natural Res. Dep't of Dennis*, 889 N.E.2d 936, 944 (Mass. 2008). However, the courts construe the meaning of "coercion" somewhat more broadly. The Supreme Judicial Court of Massachusetts defined "coercion" as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." See *Planned Parenthood League of Mass., Inc.* v. *Blake*, 631 N.E.2d 985, 990, *cert. denied*, 513 U.S. 868 (1994) (emphasis added) (quoting *Deas* v. *Dempsey*, 530 N.E.2d 1239, 1241 (1988)). In certain cases, this can include economic coercion. *Buster* v. *George W. Moore, Inc.*, 783 N.E.2d 399, 403 (Mass. 2003) ("We conclude that economic coercion alone may constitute 'threats, intimidation or coercion.'"). The exception, allowing for "non-physical coercion remains a narrow one." *Meuser* v. *Federal Express Corp.*, 564 F.3d 507, 519 (1st Cir. 2009).

In this case, Wentworth's evidence that Mayor DeMaria and Mr. Field threaten a continued campaign of regulatory harassment to deprive Wentworth of its constitutional right against compelled speech may support a claim of economic coercion under the MCRA. *Cf. Kennie*, 889 N.E.2d at 944 (finding coercion under

31

the MCRA from threats by a government official to rig the results
of a survey in order to block plaintiff's attempt to obtain a
property development permit); *Redgrave* v. *Boston Symphony
Orchestra, Inc.*, 502 N.E.2d 1375, 1378-79 (Mass. 1987)
(suggesting that threats to deprive a plaintiff of his rights
under a contract would constitute economic coercion); *Pheasant
Ridge*, 506 N.E.2d 1152 (Mass. 1987) (finding that threats by a
town selectmen to unlawfully take plaintiff's land by eminent
domain in order to block development may constitute economic
coercion.").

I denied the motion to amend on September 13, 2012 without
prejudice to being revisited after consideration of summary
judgment motion practice.  While I must dismiss the MCRA claim on
the Complaint before me, I will permit the Plaintiff to amend
with a claim against the city official Defendants in their
personal capacities.

### D. Conspiracy

It is unclear from the Complaint whether Plaintiff asserts
its claim for civil conspiracy under state or federal law.  In
its brief opposing the Defendants' motion for summary judgment,
Plaintiff defends its claim under both state and federal law.
Therefore, I address both.  Under either law, Plaintiff's
conspiracy claim fails for the same reason its MCRA claim has
failed, the individual defendants – Field, Nuzzo, and Mayor
DeMaria – are named only in their official capacities.

32

### 1. Sovereign Immunity

Under Massachusetts law, the City is to immune claims of conspiracy.  M.G.L 258 § 10(c) (M.G.L. 258 "shall not apply to . . . any claim arising out of an intentional tort . . ."); *see also Leatham* v. *Donell*, No. 954539, 1996 WL 1251390, at *2 (Mass. Super. Aug. 09, 1996) (holding that MGL 258 § 10(c) does not specifically enumerate conspiracy, but still contemplates such claims "by the language of § 10(c) in that the essence of a civil conspiracy claim is the intent to act in concert with another to the detriment of a third party").  I must therefore deny the civil conspiracy claim if predicated on state law.

It is unlikely that Plaintiff would be able to cure this defect through amendment by adding Field, Nuzzo, and Mayor DeMaria in their individual capacities.  Plaintiff makes no allegations that either of these three individuals acted outside the scope of their official capacities, except perhaps with respect to the MCRA claim, which is not yet properly before me.

### 2. Conspiracy of One

The conspiracy claim fails under both federal and state law for the independent reason that the City cannot conspire with itself.  Plaintiff alleges that Field, Nuzzo, and Mayor DeMaria acted to enforce City ordinances, albeit unlawfully.  When these employees acted in the course of their employment, they acted on behalf of the City of Everett, and a conspiracy of one fails to state a claim.  *See Platten* v. *HG Bermuda Exempted Ltd.,* 437 F.3d

118, 130-31 (1st Cir. 2008). "[A]n entity cannot conspire with itself." *Id.* Even joining officers of a corporation, such as a municipality, in their individual capacities "is not enough to make them persons separate from the corporation in legal contemplation" if they are acting in the course of their employment. *Williams* v. *Northfield Mount Hermon School*, 504 F. Supp. 1319, 1328-29 (D. Mass. 1981) (collecting cases); *see also Patriot Plastics & Supply, Inc.* v. *Polymer Corp.*, No. 93-5366, 1995 WL 809500, at *4 (Mass Super. Ct. Jan 20, 1995) ("[E]mployees cannot be liable for conspiracy with their employer."). If the law were otherwise, every wrongful action by a commercial or municipal corporation on which at least two employees conferred could give rise to conspiracy liability. Thus, the civil conspiracy claim cannot survive under either federal or state law.

## E. Substantive Due Process

Wentworth argues that Defendants' actions deprive him of substantive due process. However, the Complaint brings no such claim. Although raised in the previous motion to amend, the argument appears in a developed forum for the first time in Plaintiff's opposition to Defendants' motion for summary judgment. While Plaintiff has indicated it may again seek leave to amend the complaint to add this claim, I must observe that I would deny this aspect of the motion to amend as futile. *See Giuliano* v. *Nations Title, Inc.*, 134 F.3d 361 (Table) (1st Cir.

1998) ("[A] court may deny [motions to amend] if it believes that, as a matter of law, amendment would be futile.").

Wentworth's substantive due process claim is essentially indistinguishable from its claim for retaliation.  It is better addressed under the First Amendment:  adjudication under principles of substantive due process would be unnecessary and inappropriate.  *Nestor Colon*, 964 F.2d at 46-47 ("To the extent these cases indicate that a denial of a land-use permit in retaliation for political expression constitutes a substantive due process violation, . . . [w]e believe such conduct is better addressed in terms of the First Amendment; there is no need to turn to the due process clause.").  In *Nestor Colon*, the First Circuit held that where a substantive due process claim is "coextensive" with a First Amendment claim, there is "no need to enter the uncharted thicket of substantive due process to find an avenue for relief, and we decline to do so." *Id.* at 46.  Because Wentworth's substantive due process claim is based on exactly the same conduct and intent as its retaliation claim, I likewise decline to enter the thicket of substantive due process because the First Amendment provides the more appropriate "avenue for relief."

## F. Claims for Declaratory and Injunctive Relief

Count V of Plaintiff's Complaint seeks "Declaratory and Injunctive Relief."  An injunction is a remedy not a claim. *Green* v. *Parts Distrib. Xpress, Inc.*, No. 10 Civ. 11959, 2011 WL

5928580, at *5 (D. Mass. Nov. 29, 2011) ("[A]n injunction is not a cause of action but a remedy."). Further, Plaintiff represents that it does not seek "a declaration as to the lawful interpretation of the Everett Zoning Ordinance" because it is "irrelevant to this action," but rather seeks only a declaration as to its substantive claims. I therefore dismiss Count V of the Complaint because it styles "Declaratory and Injunctive Relief" as separate claims. I may return to these initiatives at the remedy stage of the case, should that become necessary.

### G. Frank Nuzzo

Finally, I grant Defendants' Motion for summary judgment with respect to Defendant Frank Nuzzo. Plaintiff names Frank Nuzzo, the City's Director of Code Enforcement, as a Defendant in his official capacity. Plaintiff acknowledges that it has not alleged any particular conduct or action by Nuzzo regarding Wentworth or its operations. Nor has Plaintiff adduced any evidence regarding what role, if any, Nuzzo played in the alleged political retaliation. Indeed, Plaintiff does not even mention Nuzzo in its Opposition to Defendant' Motion for Summary Judgment. With no evidence linking Nuzzo to any conduct whatsoever, let alone any unlawful conduct, I find that Plaintiff has not raised any genuine issue of material fact precluding summary judgment and that Nuzzo is entitled to judgment as a matter of law in his favor.

## IV.   CONCLUSION

For the foregoing reasons, I deny Defendants motion for summary judgment (Dkt. 14) as to Counts I and II of the Complaint, and I grant the motion as to Counts III, IV, and V.

**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE